**UNITED STATES of America,
Appellee,**

v.

**Carl J. SIMON, Robert H. Kaiser and
Melvin S. Fishman, Defendants-
Appellants.**

**Nos. 562–564, Dockets 32828–32830.**

United States Court of Appeals
Second Circuit.

Argued April 18, 1969.

Decided Nov. 12, 1969.

Certiorari Denied March 30, 1970.
See 90 S.Ct. 1235.

Peter E. Fleming, Jr., Asst. U. S. Atty. (Robert M. Morgenthau, U. S. Atty. for the Southern District of New York, Charles P. Sifton, Asst. U. S. Atty., of counsel), for appellee.

David W. Peck (Sullivan & Cromwell, New York City, Marvin Schwartz and Thomas E. Patton, New York City, of counsel), for defendants-appellants.

Covington & Burling, Washington, D. C. (David B. Isbell, James F. Strother and J. Peter Luedtke, Washington, D. C., of counsel), for the American Institute of Certified Public Accountants, amicus curiae.

Before WATERMAN, FRIENDLY and SMITH, Circuit Judges.

FRIENDLY, Circuit Judge:

Defendant Carl Simon was a senior partner, Robert Kaiser a junior partner, and Melvin Fishman a senior associate in the internationally known accounting firm of Lybrand, Ross Bros. & Montgomery. They stand convicted after trial by Judge Mansfield and a jury in the District Court for the Southern District of New York under three counts of an indictment charging them with drawing up and certifying a false or misleading financial statement of Continental Vending Machine Corporation (hereafter Continental) for the year ending September 30, 1962. After denying motions for acquittal or a new trial, the judge fined Simon $7,000 and Kaiser and Fishman $5,000 each.

Count One of the indictment was for conspiracy to violate 18 U.S.C. §§ 1001 and 1341 and § 32 of the Securities Exchange Act of 1934, 15 U.S.C. § 78ff. Section 1001 provides:

"Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both."

Section 1341 makes criminal the use of the mails in aid of "any scheme or artifice to defraud." Section 32 of the Securities Exchange Act renders criminal the willful and knowing making of a statement in any required report which is false or misleading with respect to any material fact. Counts Three and Six charged two mailings of the statement in violation of 18 U.S.C. § 1341. Nothing turns on the different phrasings of the test of criminality in the three statutes. The Government concedes it had the burden of offering proof allowing a reasonable jury to be convinced beyond a reasonable doubt not merely that the financial statement was false or misleading in a material respect but that defendants knew it to be and deliberately sought to mislead.

While every criminal conviction is important to the defendant, there is a special poignancy and a corresponding responsibility on reviewing judges

when, as here, the defendants have been men of blameless lives and respected members of a learned profession. See United States v. Kahaner, 317 F.2d 459, 467 (2 Cir.), cert. denied, 375 U.S. 836, 84 S.Ct. 74, 11 L.Ed.2d 65 (1963). This is no less true because the trial judge, wisely in our view, imposed no prison sentences. On the other hand, as we observed in the *Kahaner* opinion, our office is limited to determining whether the evidence was sufficient for submission to the jury and, if so, whether errors prejudicial to the defendants occurred at the trial.[1]

### I.

The trial hinged on transactions between Continental and an affiliate, Valley Commercial Corporation (hereafter "Valley"). The dominant figure in both was Harold Roth, who was president of Continental, supervised the day-to-day operations of Valley, and owned about 25% of the stock of each company.[2]

Valley, which was run by Roth out of a single office on Continental's premises, was engaged in lending money at interest to Continental and others in the vending machine business. Continental would issue negotiable notes to Valley, which would endorse these in blank and use them as collateral for drawing on two lines of credit, of $1 million each, at Franklin National Bank ("Franklin") and Meadowbrook National Bank ("Meadowbrook"), and would then transfer to Continental the discounted amount of the notes. These transactions, beginning as early as 1956, gave rise to what is called "the Valley payable." By the end of fiscal 1962, the amount of this was $1,029,475, of which $543,345 was due within the year.

In addition to the Valley payable, there was what is known as the "Valley receivable," which resulted from Continental loans to Valley. Most of these stemmed from Roth's custom, dating from mid-1957, of using Continental and Valley as sources of cash to finance his transactions in the stock market.[3] At the end of fiscal 1962, the amount of the Valley receivable was $3.5 million, and by February 15, 1963, the date of certification, it has risen to $3.9 million. The Valley payable could not be offset, or "netted," against the Valley receivable since, as stated, Continental's obligations to Valley were in the form of negotiable notes which Valley had endorsed in blank to the two banks and used as collateral to obtain the cash which it then lent to Continental.

By the certification date, the auditors had learned that Valley was not in a position to repay its debt, and it was accordingly arranged that collateral would be posted. Roth and members of his family transferred their equity in certain securities to Arthur Field, Continental's counsel, as trustee to secure

---

1. This is an appropriate point for rejecting defendants' argument that it was error to deny their request, opposed by the Government, for a non-jury trial. F.R. Cr.P. 23(a) conditions a non-jury trial on the Government's consent and "does not require that the Government articulate its reasons for demanding a jury trial." Singer v. United States, 380 U.S. 24, 37, 85 S.Ct. 783, 791, 13 L.Ed.2d 630 (1965). As we held in United States v. Abrams, 357 F.2d 539, 549, cert. denied, 384 U.S. 1001, 86 S.Ct. 1922, 16 L.Ed.2d 1014 (1966), the complexity of the subject matter of the alleged offense does not alone entitle a defendant to a non-jury trial over the objection of the prosecutor. It is worth noting, although not critical, that the judge doubled the ordinary number of peremptory challenges, and that the jury was highly qualified.

2. Two other large stockholders of Continental, Forbes and Hirsch, its counsel, Arthur Field, and Roth's father were the remaining principal stockholders of Valley.

3. From mid-1957 until January 1963 Continental thus advanced more than $16 million to Valley and Valley advanced more than $13 million to Roth. Of the latter sum the payment of approximately $6.5 million would have resulted in an overdraft in Valley's account but for the deposit of a Continental check on the same day.

Roth's debt to Valley and Valley's debt to Continental. Some 80% of these securities consisted of Continental stock and convertible debentures.

The 1962 financial statements of Continental, which were dismal by any standard,[4] reported the status of the Valley transactions as follows:

ASSETS
Current Assets:

\*    \*    \*    \*    \*    \*    \*    \*    \*

Accounts and notes receivable:

\*    \*    \*    \*    \*    \*    \*    \*    \*

Valley Commercial Corp., affiliate
(Note 2)                              $2,143,335

\*    \*    \*    \*    \*    \*    \*    \*    \*

Noncurrent accounts and notes receivable:
Valley Commercial Corp., affiliate
(Note 2)                              1,400,000

\*    \*    \*    \*    \*    \*    \*    \*    \*

LIABILITIES
Current Liabilities:

\*    \*    \*    \*    \*    \*    \*    \*    \*

Long-term debt,
portion due within one year          $8,203,788

\*    \*    \*    \*    \*    \*    \*    \*    \*

Long-term debt (Note 7)

\*    \*    \*    \*    \*    \*    \*    \*    \*

Valley Commercial Corp., affiliate
(Note 2)                              486,130

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

2. The amount receivable from Valley Commercial Corp. (an affiliated company of which Mr. Harold Roth is an officer, director and stockholder) bears interest at 12% a year. Such amount, less the balance of the notes payable to that company, is secured by the assignment to the Company of Valley's equity in certain marketable securities. As of February 15, 1963, the amount of such equity at current market quotations exceeded the net amount receivable.

7. \* \* \* The amounts of long-term debt, including the portion due within one year, on which interest is payable currently or has been discounted in advance, are as follows:

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*

Valley Commercial Corp., affiliate           $1,029,475

———◆———

4. The Company reported an operating loss of $867,000 and write-offs of some $3 million as compared with after-tax profits of $1,249,000 in the preceding

The case against the defendants can be best encapsulated by comparing what Note 2 stated and what the Government claims it would have stated if defendants had included what they knew:

2. The amount receivable from Valley Commercial Corp. (an affiliated company of which Mr. Harold Roth is an officer, director and stockholder), which bears interest at 12% a year, was uncollectible at September 30, 1962, since Valley had loaned approximately the same amount to Mr. Roth who was unable to pay. Since that date Mr. Roth and others have pledged as security for the repayment of his obligation to Valley and its obligation to Continental (now $3,900,000, against which Continental's liability to Valley cannot be offset) securities which, as of February 15, 1963, had a market value of $2,978,000. Approximately 80% of such securities are stock and convertible debentures of the Company.

Striking as the difference is, the latter version does not reflect the Government's further contention that in fact the market value of the pledged securities on February 15, 1963, was $1,978,000 rather than $2,978,000 due to liens of James Talcott, Inc. and Franklin for indebtedness other than Roth's of which defendants knew or should have known.

## II.

Although the facts set forth up to this point were uncontroverted, there were some sharp disagreements concerning just what defendants knew and when they learned it. Issues of credibility, however, were for the jury, and we here set forth what the jury could permissibly have found the further facts to be.

Roth engaged the Lybrand firm as Continental's auditors in 1956. George Shegog was the partner in charge; Simon was "second partner" but had no responsibility save for the review of SEC filings. Upon Shegog's death, early in 1960, Simon became the partner in charge. Kaiser was first assigned to the Continental audit as "audit manager" for the 1961 audit. Fishman had been assigned to the Continental audit in 1957 as a young junior accountant; in 1962 he was promoted to be manager of the Continental audit for that year and Kaiser was retained as "second partner." The day-to-day supervision of the audit was the responsibility of Richard McDevitt. As is usual, the structure was pyramidal in terms of time spent.

The Valley receivable had attracted attention early in Lybrand's engagement. In the late fall of 1958, Yoder, who was then manager of the Continental audit, discussed it with Roth. In a memorandum which was read by Fishman at the time and remained in the Lybrand audit files, Yoder recorded that during fiscal 1958 Continental had made net cash payments to Valley of $1,185,790, which "appeared to be for no other purpose than to provide Valley with cash." He recorded also that since September 30 Continental had made additional payments to Valley of $824,752 which were used "to finance the acquisition of capital stock of U. S. Hoffman Machine Coporation by Mr. Roth, or for loans by Valley to U. S. Hoffman." He also stated that he was informed that the receivable should be applied to notes of Continental and its subsidiaries which represented the Valley payable, and that he had agreed provided that the notes, which Valley had pledged as collateral for its borrowings from Franklin and Meadowbrook, were surrendered and made available for Lybrand's inspection. In a memorandum to Simon in November 1960, Yoder again discussed the Valley receivable, noting that the payments were frequent, in round amounts, and unaccompanied by written explanations. He observed that during the 1960 fiscal year the receivable had ranged from $695,000 in Oc-

---

year. Even with the inclusion of $2,-143,335 of the total Valley receivable of $3,543,335, current assets, $20,102,504,

barely exceeded current liabilities, $19,-043,262.

tober 1959 to $398,000 in September 1960 with a high of $1,583,000 in April 1960.

In 1961 and 1962, the cash payments giving rise to the Valley receivable continued to be frequent, in round amounts, and without written explanation. More-over, the balance in the Valley receivable account characteristically was parabolic, rising after the end of one fiscal year and falling prior to the end of the next. The payments and repayments and the year-end balances for 1958–1962 are shown by the following table:

| Year | Advances to Valley | Repayments by Valley | Receivable at Year-End |
|------|------|------|------|
| 1958 | $3,356,239 | $2,583,172 | $ —0— |
| 1959 | 4,586,000 | 3,510,451 | 384,402 |
| 1960 | 2,511,000 | 2,670,500 | 397,996 |
| 1961 | 2,390,674 | 1,520,000 | 848,006 |
| 1962 | 4,708,000 | 1,986,500 | 3,543,335 |

Although the figure for the end of 1961 was more than double that at the end of the two preceding years, and had increased to about $2 million by December 31, 1961, prior to the certification date, the 1961 financial statement made no comment on the receivable, and none of the defendants asked whether Continental's directors had been informed of the transactions. Simon merely warned Roth that an examination of Valley's books would be required if the receivable at the end of fiscal 1962 was as large as at the end of 1961.

When Fishman visited Continental's office in early September 1962 in preparation for that year's audit, he was told that as of July 31 the Valley receivable had reached $3.6 million. He was told also that Continental was operating a check float in excess of $500,000 daily, that cash was "tighter than ever," and that Continental's Assistant Comptroller had spent most of July and August "juggling cash." Fishman reported this to Simon and Kaiser, noting that "all in all, it promises to be an 'interesting' audit."

The cash audit, conducted in early October 1962, showed how stringent cash had become. The $286,000 in hand on September 30 resulted only from thirty-day loans of $1.5 million from Franklin and Meadowbrook four days earlier. The Valley receivable was found to be around $3.5 million and Fishman told Roth in late October that this was so large that "there could be a problem with the yearend audit." In answer to a question by Fishman in November why Valley needed so much money, Kalan, Continental's Assistant Comptroller, said that "Roth needed the money to maintain the margin accounts on the U. S. Hoffman stock and bonds and the Continental stock and bonds."

Early in November Fishman met with Kaiser and reviewed the history of the Valley receivable. A memorandum of November 12 from Fishman to Kaiser, with a copy to Simon, "anticipated that September 30, 1962, Continental's balance sheet will show a net receivable from Valley of approximately $1,000,000 representing the excess of cash transfers to Valley over notes issued to Valley" and stated an intention to review the collectibility of the "net receivable" by examining "the latest available financial statements of Valley and other documentation." [5]

5. The Government notes that this is the first reference to a netting of the Valley payable against the Valley receivable—something which the defendants concede they knew to be impossible in view of Valley's having pledged Continental's notes as collateral.

In December Fishman phoned Simon that the Valley receivable as of September 30 was about $3.5 million. Simon instructed Fishman to tell Roth that Lybrand would need the financial statements of Valley in order to evaluate the receivable's collectibility. Roth called Simon and said that Valley's audit was not yet finished and that the statements would be made available when it was. There were similar conversations during January 1963.

Meanwhile, according to Roth, he had contacted Simon in December and said that although Valley had a net worth of $2 million, it was not in a position to repay its $3.5 million debt to Continental as it had lent him approximately the same amount which he was unable to repay. He suggested that he secure the indebtedness with his equity in stocks, bonds and other securities of Continental and Hoffman International if this would be acceptable. Roth called Simon some ten days later and received the latter's assent. On December 31 Roth placed Arthur Field, counsel for Continental, in charge of preparing the assignments.

Late in January 1963 Fishman visited Roth and showed him a draft of Note 2 substantially identical with the final form; he told Roth that Simon wanted to see him. They met in the Lybrand office on February 6. Defendants concede that at this meeting Roth informed Simon that Valley could not repay Continental and offered to post securities for the Valley receivable, and also to post as collateral a mortgage on his house and furnishings. Simon agreed that if adequate collateral were posted, a satisfactory legal opinion were obtained, and Continental's board approved the transactions, Lybrand could certify Continental's statements without reviewing Valley's, which still were not available. There was also a discussion of verification procedures. Simon determined that Roth, with a Lybrand employee listening on an extension phone, would call the various banks and brokers then holding Roth's securities to confirm the "amount of securities pledged and the amount due to them."

On February 12 Roth told Simon that Field had the collateral ready for verification. Simon instructed Kaiser to go to Field's office. Finding that Field had made the proposed assignments run to Valley, Kaiser called this "ridiculous" and asked, "If the securities or if the cash equity gets back into Valley Commercial Corporation, what is to stop Harold Roth from taking the money out again as he did before?" On Kaiser's direction Field made the assignments run to himself as trustee for Valley and Continental. Field also discussed the available collateral and exhibited to Kaiser some handwritten notes prepared by Field and Miss Gans, secretary to Roth. These showed that the bulk of the collateral would consist of an equity in Continental stock and debentures. Kaiser made a number of calls having reference to this information and prepared notes of them which he later showed Simon; as developed in section V of this opinion, the Government alleges these demonstrated a complete encumberance of all of Roth's securities held by Franklin, Meadowbrook and James Talcott, Inc. ("Talcott"). At Kaiser's request Field prepared a letter stating that $3.5 million in collateral was being posted and outlining the mechanics of the collateralization. On the following business day, Simon called to request that Field amend the letter to include an opinion that the collateral adequately secured the Valley receivable; the amended letter was sent on February 15 or 18. Meanwhile Field had informed Simon and Kaiser on February 13 that Continental's board of directors had disapproved of the loans to Valley.

On Friday, February 15, Kaiser assigned James Harris, a supervisor who had no previous connection with the Continental audit, to confirm the collateral. Kaiser explained the agreed procedure and introduced him to Roth and Miss Gans, but did not warn him of the possibility of encumbrances at Franklin,

Meadowbrook and Talcott. The telephone calls began around 10 A.M. and continued until late afternoon when Miss Gans "started having difficulty in reaching some of the people at some of these financial institutions." The calls ended, and Harris totalled the then quoted market price of the confirmed securities, subtracted the indebtedness disclosed over the telephone, and arrived at an equity interest of some $3.1 million, this including an equity of $1.2 million in stock held at Franklin, Meadowbrook and Talcott. He telephoned Kaiser the results. Meanwhile Roth removed some $100,000 in odd securities from an office safe and offered them if Harris didn't have enough. The offer was declined.[6] The schedule was then delivered to McDevitt, who applied the closing market quotations of February 15; these reduced the value to $2,978,000.[7]

The three defendants met at Continental's plant on Saturday, February 16, and prepared a printer's draft of the financial statements.[8] Simon telephoned Roth and discussed the proposed statement, including Note 2. In the course of the conversation he requested payment of some $13,000 still owing for the 1961 audit. On Roth's instructions Kalan gave Simon a check, saying "This is going to bounce."

On Monday, February 18, Simon reviewed a printer's proof of the statements. At that time, for reasons which were not developed at trial but are now conceded to be proper, he moved from noncurrent into current assets $1,433,-104, representing a receivable from the sale of certain vending routes. At the same time, he dropped from current assets to noncurrent assets some $1,400,000 of the Valley receivable, which Roth caused to be refinanced by Valley's issuance of long-term notes in that amount. Although Simon testified that he made this change solely because of the issuance of the notes, in which he had no part, Roth testified that Simon had earlier told him that some of the $3.5 million Valley receivable would have to go "below the line"—i. e., into noncurrent assets.

---

6. Kaiser subsequently prepared a memorandum of his telephone talk with Harris. This stated that Roth had exhibited a substantial number of loose securities to show that he could bring the collateral up over the promised $3.5 million and that Roth, over the telephone, asked for time to determine which securities would be included in the collateral. The Government claimed that this memorandum, which was paginated 79a and 79b as a result of having been inserted between pp. 79 and 80 of the audit files sometime after March 7, 1963, was a fabrication.

7. Defendants claimed that they justifiably relied on Roth's promise that the collateral would include an additional $1,-134,960, as follows:

| | |
|---|---:|
| Mortgage on Roth's house and furniture | $ 625,000 |
| Loose stock certificates shown by Roth to Harris | 100,000 |
| Equity in U. S. Hoffman Machinery Corp. stock | 173,000 |
| Securities listed on schedule shown by Field to Kaiser but not confirmed by Harris | 236,960 |
| | $1,134,960 |

They relied also on Field's opinion letter stating that the receivable was secured by an equity in securities having a value of $3.5 million. However, the first two items were never included in the collateral assigned to Field as trustee. Harris left the U. S. Hoffman Machinery stock out of his list because it had been delisted and had only a nominal quotation of 43¢ per share. Some institutions listed by Field as holding securities were never checked by Harris, but in light of the inaccuracies in Field's list which were revealed by Harris' check, any attempt to evaluate the holdings at these institutions would be highly speculative.

8. Fishman's handwritten draft of the liability side of the balance sheet showed the current and noncurrent portions of the Valley payable separately from other current and noncurrent liabilities. In revising this draft, Simon included the current portion in a lump-sum figure for the total portion of long-term debt payable within a year; however, a reader could determine the current portion by subtracting the long-term debt to Valley from the total shown in Note 7.

The financial statements were mailed as part of Continental's annual report on February 20. By that time the market value of the collateral had declined some $270,000 from its February 15 value. The value of the collateral fell an additional $640,000 on February 21. When the market reopened on February 25 after the long Washington's birthday recess, it fell another $2 million and was worth only $395,000. The same day a Continental check to the Internal Revenue Service bounced. Two days later the Government padlocked the plant and the American Stock Exchange suspended trading in Continental stock. Investigations by the SEC and bankruptcy rapidly ensued.

### III.

The defendants called eight expert independent accountants, an impressive array of leaders of the profession. They testified generally that, except for the error with respect to netting, the treatment of the Valley receivable in Note 2 was in no way inconsistent with generally accepted accounting principles or generally accepted auditing standards, since it made all the informative disclosures reasonably necessary for fair presentation of the financial position of Continental as of the close of the 1962 fiscal year. Specifically, they testified that neither generally accepted accounting principles nor generally accepted auditing standards required disclosure of the make-up of the collateral or of the increase of the receivable after the closing date of the balance sheet, although three of the eight stated that in light of hindsight they would have preferred that the make-up of the collateral be disclosed. The witnesses likewise testified that disclosure of the Roth borrowings from Valley was not required, and seven of the eight were of the opinion that such disclosure would be inappropriate. The principal reason given for this last view was that the balance sheet was concerned solely with presenting the financial position of the company under audit; since the Valley re-

ceivable was adequately secured in the opinion of the auditors and was broken out and shown separately as a loan to an affiliate with the nature of the affiliation disclosed, this was all that the auditors were required to do. To go further and reveal what Valley had done with the money would be to put into the balance sheet things that did not properly belong there; moreover, it would create a precedent which would imply that it was the duty of an auditor to investigate each loan to an affiliate to determine whether the money had found its way into the pockets of an officer of the company under audit, an investigation that would ordinarily be unduly wasteful of time and money. With due respect to the Government's accounting witnesses, an SEC staff accountant, and, in rebuttal, its chief accountant, who took a contrary view, we are bound to say that they hardly compared with defendants' witnesses in aggregate auditing experience or professional eminence.

■■ Defendants asked for two instructions which, in substance, would have told the jury that a defendant could be found guilty only if, according to generally accepted accounting principles, the financial statements as a whole did not fairly present the financial condition of Continental at September 30, 1962, and then only if his departure from accepted standards was due to willful disregard of those standards with knowledge of the falsity of the statements and an intent to deceive. The judge declined to give these instructions. Dealing with the subject in the course of his charge, he said that the "critical test" was whether the financial statements as a whole "fairly presented the financial position of Continental as of September 30, 1962, and whether it accurately reported the operations for fiscal 1962." If they did not, the basic issue became whether defendants acted in good faith. Proof of compliance with generally accepted standards was "evidence which may be very persuasive but not necessarily conclusive that he acted in good faith, and that the facts as certified were

not materially false or misleading." "The weight and credibility to be extended by you to such proof, and its persuasiveness, must depend, among other things, on how authoritative you find the precedents and the teachings relied upon by the parties to be, the extent to which they contemplate, deal with, and apply to the type of circumstances found by you to have existed here, and the weight you give to expert opinion evidence offered by the parties. Those may depend on the credibility extended by you to expert witnesses, the definiteness with which they testified, the reasons given for their opinions, and all the other facts affecting credibility, * * * "

Defendants contend that the charge and refusal to charge constituted error. We think the judge was right in refusing to make the accountants' testimony so nearly a complete defense. The critical test according to the charge was the same as that which the accountants testified was critical. We do not think the jury was also required to accept the accountants' evaluation whether a given fact was material to overall fair presentation, at least not when the accountants' testimony was not based on specific rules or prohibitions to which they could point, but only on the need for the auditor to make an honest judgment and their conclusion that nothing in the financial statements themselves negated the conclusion that an honest judgment had been made. Such evidence may be highly persuasive, but it is not conclusive, and so the trial judge correctly charged.

■ Defendants next contend that, particularly in light of the expert testimony, the evidence was insufficient to allow the jury to consider the failure to disclose Roth's borrowings from Valley, the make-up of the collateral, or the post-balance sheet increase in the Valley receivable. They concentrate their fire on what they characterize as the "primary, predominant and pervasive" issue, namely the failure to disclose that

Continental's loans to Valley were not for a proper business purpose but to assist Roth in his personal financial problems. It was "primary, predominant and pervasive" not only because it was most featured by the prosecution but because defendants' knowledge of Roth's diversion of corporate funds colored everything else. We join defendants' counsel in assuming that the mere fact that a company has made advances to an affiliate does not ordinarily impose a duty on an accountant to investigate what the affiliate has done with them or even to disclose that the affiliate has made a loan to a common officer if this has come to his attention. But it simply cannot be true that an accountant is under no duty to disclose what he knows when he has reason to believe that, to a material extent, a corporation is being operated not to carry out its business in the interest of all the stockholders but for the private benefit of its president. For a court to say that all this is immaterial as a matter of law if only such loans are thought to be collectible would be to say that independent accountants have no responsibility to reveal known dishonesty by a high corporate officer. If certification does not at least imply that the corporation has not been looted by insiders so far as the accountants know, or, if it has been, that the diversion has been made good beyond peradventure (or adequately reserved against) and effective steps taken to prevent a recurrence, it would mean nothing, and the reliance placed on it by the public would be a snare and a delusion. Generally accepted accounting principles instruct an accountant what to do in the usual case where he has no reason to doubt that the affairs of the corporation are being honestly conducted. Once he has reason to believe that this basic assumption is false, an entirely different situation confronts him. Then, as the Lybrand firm stated in its letter accepting the Continental engagement, he must "extend his procedures to determine whether or not such suspicions are justified." If as a result of such an ex-

tension or, as here, without it, he finds his suspicions to be confirmed, full disclosure must be the rule, unless he has made sure the wrong has been righted and procedures to avoid a repetition have been established. At least this must be true when the dishonesty he has discovered is not some minor peccadillo but a diversion so large as to imperil if not destroy the very solvency of the enterprise.

On this dominating issue of Roth's diverting corporate funds we do not have a case where the question is whether accounts may be subjected to criminal sanction for closing their eyes to what was plainly to be seen. Fishman was proved to have known what was going on since 1958, Simon must have had a good idea about it from the spring of 1960 when Roth informed him that he had borrowed $1,000,000 from investment bankers to make a repayment to Valley, and the jury could infer that Kaiser also was not unaware. If Roth's testimony was believed, the defendants knew almost all the facts from December 1962. In any event they concede knowledge prior to the certification. Beyond what we have said, Field testified that at a meeting in February 1963 before the statements were certified, he, Simon and Kaiser discussed "how was it possible for a man like Harold Roth * * * for a man like that to go wrong and to take out this money through the circuitous method of having it first go into Valley and then to withdraw it immediately by himself * * *." The jury could reasonably have wondered how accountants who were really seeking to tell the truth could have constructed a footnote so well designed to conceal the shocking facts. This was not simply by the lack of affirmative disclosure but by the failure to describe the securities under circumstances crying for a disclosure and the failure to press Roth for a mortgage on his house and furnishings, description of

which in the footnote would necessarily have indicated the source of the collateral and thus evoked inquiry where the money advanced to Valley had gone.

Turning to the failure to describe the collateral, defendants concede that they could not properly have certified statements showing the Valley receivable as an asset when they knew it was uncollectible. That was why Roth proposed collateralization and they accepted it. As men experienced in financial matters, they must have known that the one kind of property ideally unsuitable to collateralize a receivable whose collectibility was essential to avoiding an excess of current liabilities over current assets and a two-thirds reduction in capital already reduced would be securities of the very corporation whose solvency was at issue—particularly when the 1962 report revealed a serious operating loss. Failure to disclose that 80% of the "marketable securities" by which the Valley receivable was said to be "secured"[9] were securities of Continental was thus altogether unlike a failure to state how much collateral were bonds or stocks of General Motors and how much of U. S. Steel. Indeed one of the defense experts testified that disclosure would be essential if Continental stock constituted more than 50% of the collateral. Beyond this, we are not here required to determine whether failure to reveal the nature of the collateral would have been a submittable issue if the Valley receivable had constituted an advance made for legitimate business purpose. Defendants' conduct had to be judged in light of their failure to reveal the looting by Roth. Since disclosure that 80% of the securities were Continental stock or debentures would have led to inquiry who could furnish so much, the jury could properly draw the inference that the failure to reveal that the bulk of the pledged securities was of the one sort most inappropriate to "se-

---

9. A Lybrand practice bulletin warned against use of the word "secured" since the ordinary reader would regard this as meaning "fully secured."

cure" the Valley receivable, rather than being a following of accepted accounting principles, was part of a deliberate effort to conceal what defendants knew of the diversion of corporate funds that Roth had perpetrated.

We are likewise unimpressed with the argument that defendants cannot be charged with criminality for failure to disclose the known increase in the Valley receivable from $3.4 to $3.9 million. Here again the claim that generally accepted accounting practices do not require accountants to investigate and report on developments since the date of the statements being certified has little relevance. Note 2 stated "As of February 15, 1963, the amount of such equity at current market quotations exceeded the net amount receivable." This means the net amount receivable as of February 15. If the receivable remained at the $3.9 million level it had attained at December 31, 1962, and there is nothing to indicate its reduction, the collateral of $2.9 million verified by Harris barely equalled even the "net" receivable, since the collateral, supplied long after September 30, 1962, although this also was not disclosed, concededly was security for advances after September 30 as well as before. The jury was thus entitled to infer that the failure to reveal the increase in the Valley receivable was part of an effort to create an appearance of collectibility which defendants knew to be false. Indeed one of the defense experts agreed that the increase in the receivable was a material event that required disclosure in the absence of sufficient collateral. Moreover, this issue, like the others, must be considered in context. The jury could find that failure to reveal the known increase in the Valley receivable, rather than being motivated by adherence to accepted accounting principles, was due to fear that revelation of the increase would arouse inquiry why a company in the desperate condition of Continental would go on advancing money to an affiliate and thus lead to discovery of Roth's looting.

## IV.

■ Defendants properly make much of the alleged absence of proof of motivation. They say that even if the Government is not bound to show evil motive, and we think it is not, see Pointer v. United States, 151 U.S. 396, 14 S.Ct. 410, 38 L.Ed. 208 (1894), lack of evidence of motive makes the burden of proving criminal intent peculiarly heavy and the Government did not discharge this.

It is quite true that there was no proof of motive in the form usual in fraud cases. None of the defendants made or could make a penny from Continental's putting out false financial statements. Neither was there evidence of motive in the sense of fear that telling the truth would lose a valuable account. Continental was not the kind of client whose size would give it leverage to bully a great accounting firm, nor was it important to the defendants personally in the sense of their having brought in the business. One would suppose rather that the Continental account had become a considerable headache to the Lybrand firm generally and to the defendants in particular; they could hardly have been unaware of the likelihood that the many hours the firm had devoted to the 1962 audit would not be compensated and that another might never occur. Ordinary commercial motivation is thus wholly absent.

The Government finds motive in defendants' desire to preserve Lybrand's reputation and conceal the alleged dereliction of their predecessors and themselves in former years—the failure to advise Continental's board of directors of Roth's role in creating the Valley receivable, see N. Y. Stock Corporation Law, McKinney's Consol.Laws, c. 59, § 59; the failure to expand the scope of the audit for those years to determine the nature and collectibility of the Valley receivable, despite the injunction in a well-known text originally authored by one of the founders of the Lybrand firm,

that receivables from affiliates must be scrutinized carefully to determine they "are what they purport to be"; [10] and the certification of the 1961 statements despite Simon's warning to Roth that a further increase in the receivable would necessitate an examination of Valley's books. The apparent failure of the defendants to consult with the Lybrand executive committee, or with the partner in the firm to whom "problems" in audits were supposed to be referred, on what would seem highly important policy questions concerning the 1962 audit adds force to these arguments.

The main response is that if the defendants had wanted to cover up any past delinquencies they would not have insisted on financial statements so dismal in other respects. It is alleged that defendants demanded certain adjustments which good accounting practice permitted but did not require. It is said also that defendants must have known the statements were so unfavorable, even with the limited disclosure in Note 2, that Continental was bound to fold and a full investigation would follow. The argument is impressive but not dispositive. Defendants may have harbored the illusion that the dexterity of Continental's treasurer in "juggling cash" would enable it to survive. Moreover, men who find themselves in a bad situation of their own making do not always act with full rationality.

█ Even if there were no satisfactory showing of motive, we think the Government produced sufficient evidence of criminal intent. Its burden was not to show that defendants were wicked men with designs on anyone's purse, which they obviously were not, but rather that they had certified a statement knowing it to be false. As Judge Hough said for us long ago, "while there is no allowable inference of knowledge from the mere fact of falsity, there are many cases where from the actor's special situation and continuity of conduct an inference that he did know the untruth of what he said or wrote may legitimately be drawn." Bentel v. United States, 13 F.2d 327, 329, cert. denied, 273 U.S. 713, 47 S.Ct. 109, 71 L.Ed. 854 (1926). See also Aiken v. United States, 108 F.2d 182, 183 (4 Cir. 1939). Moreover, so far as criminal intent is concerned, the various deficiencies in the footnote should not be considered in isolation. Evidence that defendants knowingly suppressed one fact permitted, although it surely did not compel, an inference that their suppression of another was likewise knowing and willful.

In addition to all that has been said on this score in the previous section of this opinion, a strong indication of knowing suppression lay in the evidence concerning the erroneous reduction of the Valley receivable by the $1 million of notes payable. Defendants say that this was mere negligence; that, beginning with Fishman's memorandum of November 12, 1962, they were "thinking net." But the jury was not bound to accept this. Even if the jury believed that Fishman had negligently slipped into error in November 1962, [11] despite his peculiar awareness of the impossibility of netting, which it was not required to do, it truly taxed credulity to suppose that, with all the attention that was given to the Valley receivable over the next three months, none of these defendants, experienced in the business of Continental, ever mentioned to the others that the critical figure was not the net receivable but the gross, as indeed the body of the financial statements showed, so that $3 million of collateral would not secure the receivable. Indeed Simon and Kaiser swore in depositions taken in a civil suit

10. Montgomery, Auditing, 180. Simon had contributed to a revision of this standard work.

11. The memorandum of November 12 is peculiar in that it refers to the anticipated net figure as approximately $1 million although the gross receivable at July 30, 1962 was known to be $3.6 million and the payable to run to some $1 million yearly. Fishman hadn't "the slightest idea" where the $1 million net figure came from.

brought by Continental's bankruptcy Trustee and before the grand jury that they had known in February 1963 that the Continental notes were pledged so that netting was impossible, and made the implausible contention, as did Fishman in his grand jury testimony, that Note 2 had not netted. Defendants' attempt to escape from all this by alleging that they learned of the pledges of the Continental notes only in discussions with a Valley employee in May 1963, may have made matters worse for them with the jury rather than better. For the employee denied the conversation and the story was inconsistent with the failure to net in the financial statements themselves and with other evidence.

█ The Government furnished added evidence of criminal intent in the shape of conflicting statements by the defendants and contradictions by other witnesses. Simon and Fishman had testified before the Referee in Continental's bankruptcy proceedings that they had discussed, together with Kaiser, whether disclosure need be made of the nature of the collateral, and had rejected this as unnecessary. Yet Simon testified at trial that no consideration had been given to this and Fishman could not recall any discussion. Simon and Fishman swore to the Referee that they had not known of Roth's borrowings from Valley until March 1963. On the other hand, Fishman admitted before the grand jury that he had known of them as early as 1958; Roth testified to telling Simon about them in December 1962; all the defendants now admit they were fully informed before the certification in February 1963; and counsel for Continental's trustee testified that Simon had admitted knowing the facts "a long time" before that. When we add the delay in getting at the critical matter of the Valley receivable, the failure to follow up Roth's offer of a mortgage on his house and furniture, and the last minute changes in the balance sheet, we find it impossible to say that a reasonable jury could not be convinced beyond a reasonable doubt that the striking difference between what Note 2 said and what it needed to say in order to reveal the truth resulted not from mere carelessness but from design. That some other jury might have taken a more lenient view, as the trial judge said he would have done, is a misfortune for the defendants but not one within our power to remedy.

## V.

In this last section of the opinion we will treat defendants' arguments concerning securities of Roth held by Franklin and Talcott, and the judge's handling of questions by the jury on this and another matter.

Kaiser's notes of his interview of February 12, 1963, with Field, which he showed to Simon on the next day, contained the following:

"Harold Roth

[Subtotal] ...................... $1,293
645,000 shs. Cont. Vend. common Market
2-11-63—4⅛ ................ $2,660M
24,000 shs. Hoffman Int'l common Market
2-11-63—3⅝ ................    87
                              ————
                              $2,747M

Above is pledged as follows:

Talcott & banks primary security is third party paper

James Talcott — 200,000 shs. Cont. Vend. com. securing Cont. Vend. & U. S. Hoffman borrowing
Franklin Natl. & Meadowbrook Banks
   445,000 shs. Cont. Vend. common ⎤
                                    ⎥ securing
   24,000 shs. Hoffman Int. com. ⎦
   Valley borrowing (1MM from each bank)
Valley will give Cont. Vend. a letter stating that upon payment of Talcott & Bank borrowing, above stock will not be disposed of except to repay Valley's note to Cont. Vend. ................. 2,747
                                    ————
                                    $4,040"

———◆———

Neither Kaiser nor Field communicated to Harris this indication that the securities held by Franklin, Meadowbrook and Talcott were subject to liens arising from borrowings other than Roth's. When Roth called Meadowbrook, with Harris listening on an extension phone, the bank stated that it held 23,600 shares of Hoffman International stock worth $80,000 which was "Security on Valley obligation," as it later confirmed in writing. Although Harris recorded this on his worksheet, he nevertheless included the $80,000 in the collateral, which defendants admit to have been an error although assertedly an inconsequential one. Franklin said it held 144,484 shares of U. S. Hoffman, 24,411 of Hoffman International and 585,600 of Continental against a loan of $1,525,000 to Roth, as it subsequently confirmed in writing. Harris' computation, as later revised by McDevitt, included an equity of $900,000 in these securities. There was an erasure, innocent on defendants' view, in the "Comments" column of Harris' worksheets in regard to Franklin. The worksheets with respect to Talcott showed a holding of 67,000 Continental shares as "Collateral on indebtedness of Con. Vend. Mach. to Hoffman Mach." Harris included these shares at $270,000, their full market value. Harris' report did not show to whom he had talked at Tal-

cott, and no written confirmation was received.[12]

■ The Government was allowed to prove by internal records of Franklin that the securities there constituted collateral for Valley's debt of $944,269 in addition to Roth's personal debt. It was also allowed to prove by internal records of Talcott that Roth had pledged 25,000 Continental shares to secure the payment of Hoffman International notes discounted by U. S. Hoffman and 40,000 shares to guarantee loans by Talcott to Crescent Vending, a total liability exceeding $1 million. The court made clear to the jury that the contention was not that defendants had seen the Franklin or Talcott records but rather that "they should have known, and shut their eyes to the inquiry." Defendants contend that even this limited use of the records was improper.

We have little difficulty in sustaining the court's ruling with respect to Kaiser and Simon. Kaiser's interview with Field, the notes of which were shown to Simon, indicated the unavailability of the securities held at the two banks and Talcott. The jury could take the failure to pass this information on to Harris and the acceptance of his schedules without further inquiry despite their confirmation of the unavailability of the stock at Meadowbrook and Talcott to be evidence of willingness to be satisfied with anything that would create the appearance of adequate security. Although defendants contend that the force of Kaiser's notes of February 12 was dissipated by another schedule given by Field allegedly on February 14 (which the Government disputes), making no reference to liens arising from indebtedness other than Roth's, this was a matter for the jury. The effect of Franklin's confirmation is dissolved if the only question propounded to it was the amount of Roth's indebtedness; furthermore the jury was not required to accept the innocent explanation of the erasure. As to Kaiser and Simon the Government was thus entitled to show, under proper instructions, what proper inquiry would have revealed. On the other hand the evidence would have been admissible against Fishman only on the basis that, his membership in a conspiracy having been sufficiently shown, further evidence of the derelictions of the other conspirators was also admissible against him. While he would have been entitled to an instruction making that clear, none was sought.

■ During the evening after the case was submitted, the jury, which had been conferring for several hours, reported it was deadlocked, but the judge instructed it to deliberate further. Before leaving the courtroom it then asked three questions:

" 'Is there evidence, undisputed or otherwise that the 2.9 million collateral had prior liens?'

"That is question No. 1.

"Question No. 2:

" 'Where did the proceeds of the home and furnishings mortgage go?'

"Now 3:

" 'Was there testimony to the effect that the $2,900,000 was reduced to $1,-700,000?' "

After an endeavor to answer these had led to extended colloquy, the judge dismissed the jury for the night, heard counsel again the next morning, and then addressed the jury.

Instead of answering the first question categorically, the judge made a painstaking summary of all the evidence in which he developed the conflicting contentions and the inferences the jury could draw or not as it saw fit. With a single exception discussed in the margin,[13] defendants

12. In his deposition in the Trustee's suit Harris had testified to a vague recollection that he had included these securities because Roth had wanted them included and had indicated an intention to replace them at Talcott with other collateral, to wit, his home.

13. Defendants contend the judge should have instructed that the Continental shares pledged with Talcott were good

make no criticism of the summary, and we can find no basis for any. The judge then said he would defer answering the third question because he did not understand the meaning of the words "reduced to." While it might have been better if the judge had simply referred back to what he had already said, we see no error of which the defendants can complain. The judge's detailed answer to the first question provided the best possible assistance with respect to the third, and he could not properly have given the categorical negative answer the defendants desired.[14]

We likewise see no basis for criticizing the judge's answering of the second question by reading to the jury the relevant testimony of Simon and Field. This made clear that, although Roth had assigned the mortgages to Valley and Continental ultimately received them, they were not included in the collateral for the payment of the Valley receivable which constituted the basis for defendants' assertion of adequate collateralization.

We have carefully reviewed the few other arguments made by the defendants but do not consider them of sufficient importance to justify prolonging this already long opinion. This was a trial bitterly but honorably fought, by exceedingly capable and well-prepared counsel, before an able judge experienced in complicated litigation and a highly intelligent jury. Finding that the evidence was sufficient for submission to the jury and that no legal errors were committed, we must let the verdict stand.

Affirmed.

---

collateral as a matter of law despite Talcott's lien on them to secure what Kaiser's schedule reflected as a Continental note to U. S. Hoffman. The argument, which the judge fairly presented to the jury, is that if Continental paid the note, it would receive the collateral, whereas if it did not pay, it would get the advantage of application of the collateral in reduction of the note without Roth's being subrogated to Talcott's claim for that amount. However, the jury could find that the prospect of Continental's paying the note was remote and that the availability of collateral to reduce a liability of Continental did not make it proper security for the collectibility of the Valley receivable. Furthermore, the true facts, revealed in Harris' worksheets, were that the stock was security for a liability not of Continental but of two other companies.

14. Defendants likewise complain that the judge did not develop that there may have been collateral in addition to the $2.9 million reflected in Harris' worksheets and McDevitt's revision, see fn. 7. But the questions were framed by the jury and defendants made no request for the judge to deal with this point.