## LUSE v. UNITED STATES.*
### No. 6348.

Circuit Court of Appeals, Ninth Circuit.
April 6, 1931.

*Rehearing denied June 15, 1931.

242

Paul W. Schenck and John M. Bowen, both of Los Angeles, Cal., for appellant.

Samuel W. McNabb, U. S. Atty., and Gwyn S. Redwine and P. V. Davis, Asst. U. S. Attys., all of Los Angeles, Cal.

Before RUDKIN, WILBUR, and SAW-TELLE, Circuit Judges.

WILBUR, Circuit Judge.

Appellant was convicted on two counts of an indictment charging him with having committed perjury upon the trial of himself and four others for a violation of section 215 of the Federal Penal Code (18 USCA § 338) relating to schemes to defraud by the use of the mails. The first count upon which appellant was convicted charged him with having falsely testified that he had a conversation with one Blaylock, in Los Angeles, Cal., on January 6, 1930, concerning a deal between appellant and one Yardley. The second count related to testimony concerning a transaction between the accused and one Edna Abbott. This count of the indictment was dismissed by the district attorney after the court had sustained appellant's motion for a directed verdict. The third count charged that appellant committed perjury in denying a certain conversation with E. J. Kelly concerning a profit which would be realized from a proposed exchange of Kelly's residence in Inglewood, Cal., for an oil lease on Texas property. Appellant was sentenced to imprisonment for five years on each count, sentences to run concurrently, and to pay a fine of $1,000 on each of said counts.

The principal point involved in the evidence and allegations concerning the charge of perjury in the first count relate to the whereabouts of W. T. Blaylock. The appellant having testified in the mail fraud case that he had the conversation with Blaylock in Los Angeles concerning a transaction with Yardley, one of the alleged victims of the scheme to defraud, the Government claims that on the 6th day of January, 1930, the day upon which the conversation is alleged to have occurred in Los Angeles, Blaylock was actually in the town of Italy, Tex., and that he had been there continuously for nearly three years, and that he remained there until some time in February, when he did go to Los Angeles. In support of the government's claim that Blaylock was in Italy, Tex., on the 6th day of January, 1930, ten witnesses were introduced who corroborated Blaylock's testimony that he was in Texas on that date. As further corroborative evidence, the government, in its case in chief, introduced two additional lines of evidence, to which appellant interposed seasonable and appropriate objections. The first item objected to was a contract purporting on its face to have been signed in Los Angeles on the 6th day of January by Blaylock. This instrument had attached thereto a certificate of acknowledgment certifying that it was acknowledged before a notary on that day in Los Angeles, Cal. The tendency of this instrument was to rebut the government's contention if it was admissible at all, a question which we will presently consider. To overcome this evidence, which at best was anticipatory of appellant's defense, evidence was introduced and handwriting experts were called in an attempt to establish that the signature to the document was in the simulated handwriting of W. T. Blaylock and that this simulation had been accomplished by means of tracing a genuine signature of Blaylock's. This evidence might have been proper if the defendant had first offered the document to prove the presence of Blaylock in Los Angeles on the 6th day of January, and if such document had been received either with or without objection on the part of the government, but to introduce such evidence in the first instance could hardly avoid impressing the jury with the fact that there was something wrongful in the tracing of the signature of Blaylock, whereas the theory of the government was in this case, as well as in the mail fraud case, that Blaylock was a mere dummy, and that appellant had used his name constantly and repeatedly and was authorized so to do by Blaylock, and that Blaylock had no interest

whatever in the transactions which were carried on in his name. In this connection it may be stated that in the charge to the jury the simulation of handwriting was referred to as forgery, although upon objection the word "forgery" was withdrawn.

In rebuttal the appellant testified that Blaylock was actually in Los Angeles on the 6th of January as he had sworn on the previous trial for fraud, and he offered the testimony of the notary public and of another witness in his office who corroborated that statement. We thus have ten witnesses for the prosecution and three for the defense in direct conflict as to the whereabouts of Blaylock on the 6th of January. The government, however, not content with the overwhelming number of witnesses it had produced to establish the presence of Blaylock in Texas, including the testimony of Blaylock's wife and mother, who had been constantly aware of his whereabouts during the entire period, introduced in chief by way of further corroboration certain checks drawn by Blaylock on the First National Bank of Italy, Tex., a promissory note signed by him on or about that date, together with about 100 checks drawn upon that bank during the three-year period preceding and immediately succeeding the 6th day of January, 1930. In addition to the testimony of Blaylock that these several checks were drawn on the date specified, we have the physical fact that the checks were canceled by perforation by the bank upon which they were drawn sufficiently near the date of the check to make it reasonably certain that the checks were not signed as far away from the bank which had paid them as Los Angeles, Cal. The jury must have been impressed with the large volume of evidence of this character, and particularly with the instruments signed by Blaylock at Italy, Tex., on January 6, 1930. We cannot see that any of this evidence was properly admissible. The various documents referred to so far as this case is concerned were mere memoranda which could be referred to and which were referred to by the witnesses concerned for the purpose of refreshing their memory. It is fundamental that such memoranda are not admissible unless demanded by opposing counsel, in which event, of course, the purpose of the memoranda is to discredit rather than corroborate the witness's testimony. At first blush we are impressed with the possibility that there was some justification for the introduction of checks which were paid so soon after their date as to show that the checks were not signed in Los Angeles on the date specified, but on reflection it is clear that the probative effect of such evidence would depend upon the testimony of the witness that he signed the document on the date it bears; therefore the checks did not tend to corroborate, but their weight and effect depended upon the evidence of witnesses whose veracity was involved in the case. Counsel for the government seem to contend that in a perjury case, where conviction cannot be had on the uncorroborated testimony of a single witness, that such evidence is admissible by way of corroboration where it would not be in another case where such corroboration is not required by statute. This view assumes that such evidence is corroboration, and, if it is corroboration in a case of perjury, it would be corroboration in any other case, and it is desirable to corroborate the testimony of a witness in every case where his testimony is disputed.

The government claims that, if there is any error in the introduction of the contract dated January 6th, purporting to have been signed at Los Angeles by Blaylock on that day, such error was cured by the subsequent testimony of the appellant and his witnesses that the document was so signed on that date. It is true that this testimony would have made the evidence of the government in that regard proper rebuttal testimony, but it does not follow that the error in admitting it in chief was not prejudicial. The real difficulty in the case is that the government used mere memoranda as substantive evidence. It not only had the advantage of a large volume of that evidence in the case in chief, but by its case in chief it also placed the appellant in the position of having fabricated a similar memorandum, and thus discredited him by showing that he manufactured evidence, although the evidence alleged to have been fabricated was not properly admissible, either in chief or in rebuttal.

The third count charges the following answer given by appellant to the following question to be false: "When you were in bed, he [meaning E. J. Kelly] said he [meaning E. J. Kelly] didn't like to be left without any cash, and you said, 'If you take it, I will guarantee to make you $100,000 in two years,' and the next morning he [meaning E. J. Kelly] went out with you to his [meaning E. J. Kelly's] wife and asked you to tell her what you had said to him [meaning E. J. Kelly] during the night, and asked if you would state it again, and you then said in the presence of Kelly's wife again, if he [meaning E. J. Kelly] would take this deal and trade

the Inglewood house, you would make him [meaning E. J. Kelly] $100,000 in two years? Answer: That is not true." And assigns its falsity in the following language: " * * * It was true that the said defendant A. F. Luse did state to the said E. J. Kelly at said time and place, as testified to by the said E. J. Kelly, and as referred to in said question by said Paul W. Schenck, that he would guarantee to make $100,000 in two years, and it was further true that the next morning the said A. F. Luse and the said E. J. Kelly went out to the wife of E. J. Kelly and the said E. J. Kelly asked the defendant, the said A. F. Luse, to tell the wife of the said E. J. Kelly what the defendant A. F. Luse had said to him during the night and asked the said A. F. Luse if he would state it again, and the said defendant, A. F. Luse, then and there, in the presence of E. J. Kelly's wife, again stated that if he, the said E. J. Kelly, would take this deal and trade his house that he, the said defendant, A. F. Luse, would make him $100,000 in two years. * * * "

Upon the trial E. J. Kelly testified, in part, as follows: " * * * This conversation was between he and I in bed together; I was asking $15,000 for my house; he asked me several times what I wanted for my home, and I told him $15,000, and he wanted to trade that in for 100 acres of this oil property; this was the talk while we were in bed together; he said he wanted to hold 200 acres for himself but wasn't able to take the 200 acres, but if I would take $12,500 for my home instead of $15,000, which I asked, and trade it in for 100 acres of that 200 acres he would take the other 100 acres himself, and I told him I didn't like, hardly, at my age, trading all I had in that way and not getting any money, not having money to do anything else with, and he says, 'Well, you go ahead and trade it in and I will guarantee to make you $100,000 inside of two years on that lease;' and so the next morning I got up and went out and done my chores and came back in and Mr. Luse was up and the wife was getting breakfast and I asked the wife if Mr. Luse had told her anything about the conversation we had last night in regard to trading our home off for 100 acres. She said 'No.' I asked Mr. Luse to repeat that to the wife, which he did; he said the same thing he did to me, what I just stated; he said if we would trade our home in for that 100 acres he would guarantee to make us $100,000 within two years on the lease; that was word for word what he said, too; my house was 322 East Plymouth street, Englewood."

Mrs. Ada Kelly, his wife, testified, in part, as follows:

" * * * Mr. Kelly came in and asked me if Mr. Luse had told me about the conversation they had the night before, and I said No, and he turned around to Mr. Luse and asked him to repeat the conversation they had; Mr. Luse said there was a piece of property down in Texas a man had and he wanted $25,000 for the property, and he said he couldn't handle it all and if we would trade in our Englewood property for $12,500 he would take the other half and that he would guarantee to make us $100,000 within two years."

" * * * Mr. Kelly came into the kitchen; Mr. Luse and I were already in the kitchen; Mr. Luse and I had had no talk concerning land before Mr. Kelly came in. * * * "

It will be observed that the question contained in the indictment includes the element that the appellant and Kelly went out together to Kelly's wife and Kelly asked Luse to tell her what had been said to him during the night. It is a familiar rule of pleading that a conjunctive denial is an ineffective denial of the several conjoined statements for the reason that, if any one of them is not true, the conjunctive denial would be true. Bancroft's Code Pleading, vol. 1, sec. 407, and cases cited; 21 Cal. Jur., § 105, and cases cited; Pomeroy's Code Remedies, (5th Ed.) § 509; see, also, §§ 513, 514 id.; 49 C. J. 273, § 337. This rule would seem to be peculiarly applicable to a situation where a defendant is charged with perjury in the denial of several conjoined statements. If any one of those statements were untrue, his answer to the conjunctive question would be true. We must therefore hold that the appellant was not guilty of perjury, if, as the uncontradicted evidence shows, the above referred to portion of the conjunctive question was untrue. The motion for directed verdict on count 3 should have been granted.

In view of the necessity of a new trial on count 1, we will consider a question which will no doubt again arise on such trial. One of the main difficulties presented in the trial of the case was that of proving that the false testimony alleged to have been given on a former trial was material to that trial. It is stated that trial of the former case occupied over a month, that the transcript of the testimony contained about 4,000 pages. The trial of the former case charging fraud involved many transactions over a long period of years (1922–1930). The appellant's most

serious complaint of the course taken by the court below relates to the prejudicial effect of the reading before the jury of the transcript of the evidence given in the former trial, which evidence, it is rightfully claimed, was extremely prejudicial to the appellant because it tended to show that he had been guilty of defrauding widows and others. This claim is predicated upon the proposition advanced by appellant on appeal and acted upon by the court below in its rulings upon the admissibility of the evidence and in its instructions to the jury, to the effect that the question of the materiality of the false evidence alleged to have been given by appellant in the former trial to the issues in that trial was a question of law to be determined upon the trial of this case by the judge; that this question was one not proper to submit to the jury, and that therefore, inasmuch as the testimony adduced upon this subject was for the benefit of the court and not the jury, it is not sufficient to instruct the jury that such evidence was for the consideration of the court alone, because it was a psychological impossibility for a jury to follow such an instruction, and prejudice was therefore inevitable because of the mass of testimony tending to show the fraudulent character of the operations of the defendant as disclosed by the portions of the transcript read in the presence of the jury.

It is unquestionably true that the materiality of the evidence adduced upon the former trial was a question to be determined by the trial judge. This was a question of law, but in a charge of perjury the question of materiality of the evidence adduced upon the former trial is necessarily a mixed question of law and fact. That is, it is not an abstract question of law, but depends upon what occurred upon the former trial. Materiality depends primarily upon the issues involved in the former trial and upon the evidence adduced in support of these issues. What the evidence was, and what the pleadings were upon that trial is a question of fact. Whether the testimony alleged to be perjured was material to such issues is a question of law. In this case counsel stipulated that the transcript could be read with the same force and effect as though the various official court reporters who had phonographically reported the testimony and transcribed the same were personally present and testifying to the correctness of their phonographic notes and the transcription thereof. But the plea of not guilty interposed by the defendant traversed the fact that such testimony was given at all,

and it was for the jury to say from all the evidence whether such testimony was given upon the former trial. The charge of the court to the jury as to the materiality of the testimony alleged to have been perjured must necessarily be predicated upon the assumption that the evidence and the pleadings read before the jury were those involved in the previous trial, although the jury might have concluded otherwise. For the court to determine the materiality of the false testimony it was necessary for it to assume these facts in a hypothetical instruction. In the case at bar there was no serious contention as to what occurred upon the previous trial, court and counsel both apparently assuming that the pleadings and transcript presented and read before the jury in this case were virtually conclusive on the parties, but this assumption, in the absence of a stipulation to that effect, did not establish what evidence had been actually introduced upon the fraud trial. Our view of the situation may perhaps be made more apparent if we consider the problem presented by the prosecution of a charge of perjury where no court reporter was present upon a former trial, particularly in a case where the witnesses testify through an interpreter. In such a case it is evident that the most difficult question of fact to be determined in the trial for perjury would be the ascertainment of the fact as to what evidence was given upon the former trial, which would make the alleged perjured testimony material upon that trial. The difficulties of such a situation are illustrated by cases in which an attempt had been made to convict a Chinese witness of perjury. It was held in People v. Lee Fat, 54 Cal. 527, that the reporter could not testify from his notes taken upon the former trial, but that some other witness should be called to prove what the accused swore to on the previous examination. In People ex rel. Lee Lin Tai v. Hewill, 56 Cal. 117, it was said that the interpreter, or some other witness who heard and understood the language in which the statements of the defendant were made, should have been called to prove them.

While the stipulation of counsel in this case as to the correctness of the reporter's notes greatly facilitated the trial of the case, it does not follow that this stipulation removed from the consideration of the jury the question of fact involved in a determination of the materiality of the evidence, namely, as to whether the evidence offered to show materiality was actually given in the former trial. This was a question for the jury.

There is another aspect in which it is proper for the jury to consider the evidence presented in the trial court with relation to the pleadings and testimony given in the fraud case, namely, the question of whether or not the evidence alleged to be perjured was willfully given. That question also was for the jury. Assuming that the evidence read from the transcript was actually given upon the trial of the former case, it was for the court to say whether or not the false evidence was material and for the jury to say whether the false evidence was given willfully. In determining that question it was necessary for the jury to have before them the same picture which was presented to the judge to determine its materiality. It was from this evidence that they were to determine whether or not the evidence was given inadvertently or willfully. Nothing is more common in court than an honest mistake as to dates, and, in view of the fact that the first charge of perjury was predicated upon a given date, it was necessary for the prosecution to establish beyond a reasonable doubt that the false evidence was not given inadvertently. The jury should be fully instructed as to the purpose and effect of such evidence.

Appellant raises numerous other questions which are not likely to recur on new trial, and for that reason we deem it unnecessary to consider them.

Judgment reversed.