Leo VITELLO, Appellant,

v.

**UNITED STATES of America,**
**Appellee.**

No. 23450.

United States Court of Appeals,
Ninth Circuit.

April 13, 1970.

Rehearing Denied May 13, 1970.

J. Perry Langford (argued), San Diego, Cal., for appellant.

Raymond Zvetina (argued), Asst. U. S. Atty., Harry D. Steward, U. S. Atty., San Diego, Cal., for appellee.

Before MERRILL, ELY and KILKENNY, Circuit Judges.

KILKENNY, Circuit Judge:

Appellant was convicted by a jury of the crime of perjury [1] in connection with certain testimony given before a grand jury. The indictment charged appellant with perjury in three particulars; first, in falsely swearing that he never placed a bet with any bookmaker in the United States other than a Mr. Harrison; second, in falsely swearing that he did not know Charles Otis Spencer; and, third, in falsely swearing that he never placed a bet with Ruth Hughes. We affirm.

Although there are a few minor disputes, the following is a fair statement of the evidence on which the jury convicted the appellant. He was a well known businessman in Oceanside, California and also a horse player who claimed he didn't want to deal directly with bookmakers.

Harrison was the owner of a pharmacy located in the same block as the shop operated by appellant. Between 1958 and 1962, Harrison, who was not a bookmaker, had an arrangement with appellant whereby the former regularly took bets from appellant and passed them on to the bookmakers. Because appellant did not want to place bets under his own name, it was agreed that they would be placed under Harrison's name. Harrison, however, told the bookmakers that appellant was actually placing the bets.

It is clear that appellant, Harrison and Spencer, during the period 1958–1962, met frequently. Spencer estimated the number of the meetings between two and three hundred, while appellant said he had seen Spencer only ten to twenty times. Spencer said that appellant had placed bets with him. Although appellant testified before the grand jury that he did not know and had never met Charles Otis Spencer, he testified on trial that he had known Spencer as "Spence" and that he did not recall or think of Spencer at the time he testified before the grand jury. Subsequent to indictment, appellant requested permission to again appear before the grand jury and correct his testimony that he did not know Spencer. Permission was refused.

Ruth Hughes (Hughes) testified that she had taken bets from appellant through Harrison and through one Lee Hill. On one occasion, she testified, appellant had missed Lee Hill and placed a bet with her, asking her to record the bet under the name "Woody". The record reveals that at this time appellant was the proprietor of the Wood Art Shop in Oceanside. Appellant, on that occasion, stated that he would leave the money at Harrison's pharmacy. On the following day, Hughes found that he had failed to do so. She went to appellant's shop and collected directly from appellant. Hughes recalled one particular occasion when she received a call to go to Harrison's home and pick up a bet on a "hot tip". At the home, she found appellant, James Harrison and a third uni-

---

1. 18 U.S.C. § 1621.

dentified person. The bets were written down together for two or three hundred dollars. The record is not clear as to the person doing the writing or delivering the money to Hughes, but it is clear that all three were in on the bet. Harrison testified that on another occasion when appellant had money coming from Hughes and wanted the money, appellant said, "Let's go over to that so and so's [2] house." Harrison said this occurred while he was having a few drinks with appellant and that he told Hughes about it. On a subsequent occasion, Hughes requested an apology. Appellant did not hesitate to apologize, although on trial he admitted apologizing, but did not recollect having called Hughes a bitch.

Byers, a bakery driver, testified that while making deliveries on his route, he would carry bets from appellant to one Alice McKellar, a bookmaker on the route. Appellant was the only person for whom Byers carried bets. On one occasion, when there was a dispute over whether appellant had won on a particular horse, Byers suggested that he call the bookmaker. However, appellant said he didn't want anything to do with the bookie.

Appellant makes the following contentions:

    I.  Where a perjury indictment charged three false statements in one count, and the jury was instructed that it might predicate a guilty verdict upon any one, the defendant is entitled to a reversal on appeal upon a showing of prejudicial error as to any one statement.

    II.  The defendant's right to a jury trial, guaranteed by the Sixth Amendment to the United States Constitution, was violated, because the trial court failed to instruct the jury that all twelve jurors must agree unanimously upon at least one of the statements as having been perjured, in order to return a verdict of guilty.

    III.  Where an allegedly false statement is subject to more than one interpretation, the Government is required either to establish by sufficient evidence that the statement is false under all interpretations, or to prove that the defendant intended a meaning under which the statement is shown by sufficient evidence to be false.

    IV.  Ruth Hughes' testimony that the defendant had placed a bet with her by telephone and that she had later collected from him personally was uncorroborated.

    V.  Although the question whether testimony was material to the issues shown by the evidence is one of law for the court, the trial court erred in taking from the jury the factual question of the scope of the grand jury's investigation at the time the defendant testified before it.

    VI.  The trial court erred in ruling that the defendant's allegedly false statements were material.

We believe Contentions I, II, III and IV are so closely related that, for intelligent treatment, they must be considered together.

Appellant does not question the constitutionality of the statute under which he was convicted. Nor does he challenge the well settled law permitting the inclusion of several specifications of falsity in a single count of perjury and that proof of any one of such specifications is sufficient to support a verdict of guilty. Arena v. United States, 226 F. 2d 227 (9th Cir. 1955), cert. denied 350

2. Bitch's.

U.S. 954, 76 S.Ct. 342, 100 L.Ed. 830; United States v. Edmondson, 410 F.2d 670, 673, n. 6 (5th Cir. 1969); Stassi v. United States, 401 F.2d 259 (5th Cir. 1968). He, among other things, argues that the record, including the instructions of the court, shows a violation of his Sixth Amendment right to a jury trial because the court failed to instruct the jury that all twelve jurors must unanimously agree upon at least one of the statements as charged in the indictment, before they could return a verdict of guilty.

Yates v. United States, 354 U.S. 298, 311, 312, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957); Stromberg v. California, 283 U.S. 359, 367–368, 51 S.Ct. 532, 75 L.Ed. 1117 (1931); Cramer v. United States, 325 U.S. 1, 36, n. 45, 65 S.Ct. 918, 89 L. Ed. 1441 (1944); Leary v. United States, 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969), and Street v. New York, 394 U. S. 576, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1969), in general, support appellant's theory. Significantly, however, each of the cases, with the exception of *Yates*, involved a conviction which might have been based, in part, upon a constitutionally invalid statute. In *Yates*, the court submitted to the jury two overt acts, including an overt act which had been barred by the California statute of limitations. Since there was no way of knowing whether the jury based its verdict upon the barred act, or the other alternative, the Supreme Court reversed.

For the purposes of this decision, we accept appellant's view of the effect of *Yates*, and that the teaching of that decision should be here applied if we find (1) that there was insufficient evidence to be submitted to the jury on any one or more of the specifications of falsity, or (2) that the court's instructions on unanimity were not sufficiently clear or specific to warrant our drawing the inference that the jury understood that it must find unanimous agreement of guilt on one or more of the specifications before it could return a verdict of guilty.

On trial, there was little dispute on the facts. The appellant, in his supple-mental brief, to all intents and purposes, accepts and adopts the government's fact statement.

■ (1) Only on the Ruth Hughes specification of falsity does the appellant make a serious claim of a lack of essential corroborating evidence, which is required in a perjury case. Weiler v. United States, 323 U.S. 606, 65 S.Ct. 548, 89 L.Ed. 495 (1945). Appellant concedes that the corroborating evidence need not, of itself, establish the *corpus delicti*, Arena v. United States, 226 F.2d 227, 232–234, 236. This contention necessarily brings before us the falsity charge in the indictment with reference to Hughes. It follows:

"Q. Do you know Ruth Hughes?

"A. Yes.

"Q. How long have you known her?

"A. Probably ten years or so.

"Q. Have you ever placed a wager with her?

"A. No, sir.

"Q. Did you ever place a bet with Ruth Hughes?

"A. No, sir.

"Q. Did you ever talk to Ruth Hughes about her establishment?

"A. No, sir.

"Q. Have you ever placed a wager in person or by telephone with Ruth Hughes?

"A. No, sir."

We agree with appellee that the substance of the rule on corroboration is grounded on the principle that a conviction for perjury should not rest entirely upon an oath against an oath. The principal thrust of appellant's argument deals with the lack of corroboration of the alleged telephone conversation mentioned in the indictment and Hughes' testimony on the same subject in trial. We might well support appellant's view if his denial before the grand jury was limited to the single telephone wager. We find no such limitation in the charge in the indictment, nor in appellant's tes-

timony before the grand jury. There he testified, without qualification or limitation, that he had never placed a wager with Ruth Hughes, telephonic or otherwise. In the trial, Hughes testified not only to the telephonic bet by the appellant, but to a bet of two or three hundred dollars made by appellant and two others in Harrison's home. Additionally, she testified without objection, that she took bets from the appellant through Lee Hill and through Mr. Harrison. On one occasion, when Hughes had reservations at Santa Anita, Lee Hill asked appellant to go along. Appellent accompanied them to the race track and after the races were over, they all had dinner together. It was on the return trip from this occasion that appellant apologized for calling Hughes a "bitch". Previous to the apology, Hughes had related to appellant what Harrison had told her about the circumstances under which he placed the promiscuous brand on Hughes. Harrison's testimony paralleled that of Hughes. He testified that he passed appellant's bets on to Mr. Spencer and to Hughes, perhaps twice a week, interrupted with an occasional period of no bets, and that he told appellant the name of the persons to whom he was passing the bets. He further testified that he had conversations with appellant about the non-use of his name in placing bets with Hughes. Harrison's agreement with Hughes was that appellant's bets would be made under Harrison's name. Harrison recalled one occasion, on a collection from Hughes, when appellant wanted to go over and get it that night, saying that he had some betting money coming from Hughes, "Let's go over to that so and so's house." Harrison said he subsequently told the substance of the conversation to Hughes. Clearly, during the period in question, appellant became indebted to Hughes on his gambling activities. Harrison so testified. He also testified that Hughes would come to his store, making inquiry as to whether he had money for her on appellant's gambling debts. Harrison said that he

would call appellant and tell him that Hughes needed the money. On those occasions, appellant would promise to, and did later take the money to Harrison's store. Later, Hughes would drop by and pick it up. Harrison also recalled another time when he asked Hughes to his home. Appellant was there. They had a drink and both gave Hughes a bet.

Appellant quibbles about not fully understanding the nature of the questions before the grand jury. He was fully and completely informed as to the nature of the grand jury hearing. He knew the grand jury was inquiring into gambling, horse race betting and other subjects. The record demonstrates that he is a man of at least normal intelligence. When he was asked the questions with reference to Hughes, "Have you ever placed a wager with her?" and "Did you ever place a bet with Ruth Hughes?", and "Did you ever talk to Ruth Hughes about her establishment?", and "Have you ever placed a wager in person or by telephone with Ruth Hughes?", he well knew that the answers should be "Yes", while he was responding to each of the questions, "No, sir."

Additional proof that appellant originally thought the questions quite unambiguous is that he testified at length during the course of the trial and never once claimed that he misunderstood any one of the questions. His answers to questions during the course of his examination clearly show he did not intend to limit "place a wager", to a transaction with a person with whom he was dealing directly. To the contrary, his testimony, on trial, demonstrates that his instinctive reaction was to consider the "bet" as placed, not with Harrison, but with Hughes, the person to whom it was ultimately conveyed. Under no other interpretation can we understand the vast volume of testimony with reference to appellant picking up winnings from Hughes, claiming additional winnings from her and Hughes making demands on appellant for payment of bets.

In Harrison's post-trial affidavit, he attempts to support appellant's contention that appellant did not "give a bet" to Hughes, thereby attempting to place an entirely different construction on the phrase than he had at trial. Even if it was properly before us, his affidavit is so obviously at variance with his clearcut testimony at the time of trial that the statement in the affidavit should be taken *cum grano salis*.

The cases are legion defining a "bet" as nothing more or less than a "wager". People v. Oreck, 74 Cal.App.2d 215, 168 P.2d 186, 190 (1946). The words are treated as synonymous in the Federal Gaming Statutes, 18 U.S.C. § 1084(a), Sagansky v. United States, 358 F.2d 195, 200 (1st Cir. 1966). Even the most commonplace of dictionaries, Webster's New Collegiate, gives the words similar treatment.

We are not naive enough to believe that appellant actually distinguished between "give a bet" and "make a wager". Neither are we impressed with the suggestion that he thought in answering the questions before the grand jury that the inquiries were pointed toward a direct arrangement with Hughes, rather than through the intermediary Harrison. Even those of us who may be confined to the lonely halls of justice have dim recollections of other days and, handicapped as we are, we could not have misunderstood the thrust of the inquiries before the grand jury or on the trial. By his own admission, appellant had been betting on horses from the end of World War II to the time of the grand jury inquiry. His expertise in the field precludes any misunderstanding as to the meaning of the questions before the grand jury. The trial court's analysis of the appellant's attitude on his motion for a new trial is worthy of quotation.[3]

On trial, appellant's answers to relevant questions were sometimes quite evasive and far from satisfactory. Small wonder the members of the jury resolved the issues against him. The jury was carefully instructed that one of the essential elements of the crime of perjury to be proved by the prosecution was that the testimony before the grand jury was given willfully and with the knowledge or belief that it was false. The jury was told that was an issue for its members to decide.[4] On appeal, we are guided by the rule that the evidence must be viewed in the light most favorable to the government. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); Moody v. United States, 376 F.2d 525, 527 (9th Cir. 1967); Vuckson v. United States, 354 F.2d 918, 921 (9th Cir. 1966). Likewise, all rea-

---

3. "MR. SCHWARTZ:[*] There is no basis for lying.

THE COURT: I am not impressed with that. I wasn't impressed at the time. He wasn't trying to protect anybody else. He was trying to protect what he thought was his own good name. For some reason or other he wanted to have nothing to do with bookies, and so he tried as best he could to insulate himself from bookies. Instead, he would use somebody else. He would go through Harrison or Byers or something like that, but he would not acknowledge to anybody that he could help that he had dealt with bookies, and he tried to do the very same thing with the Grand Jury, and he wasn't protecting Spencer. He wasn't trying to protect Hughes. He was trying to protect Vitello so that the Chamber of Commerce would still say, 'He doesn't deal with bookies.' "

[*] Appellant's trial attorney.
(R.T.Vol. V, pp. 224-225).

4. "One essential element of perjury is that the statement be made under oath and made wilfully by a person who knows or believes that the statement is false or is aware of his ignorance, whether or not the same is true. Hence, where there was no wilfull, and consequently no criminal intent as far as the statement is made under an honest mistake and a belief that it is true, there is no perjury, even though *the statement actually may be false.*

The word 'wilfull' as used in these instructions means the making of an alleged perjurous statement with the consciousness that it was false, or with the consciousness that the maker thereof did not know that it was true. And with the intent that it should be received as a statement of what was true."

(R.T.Vol. IX, p. 7, lines 2-13).

sonable inferences supporting the verdict are in favor of the government. Diaz-Rosendo v. United States, 357 F.2d 124, 129 (9th Cir. 1966), cert. denied 385 U.S. 856, 87 S.Ct. 104, 17 L.Ed.2d 83.

The testimony of Hughes was corroborated not only by Harrison, but also by the totality of circumstances shown by the entire record. What we have said concerning the phrases "take a bet" and "place a wager" is equally applicable to the Harrison and Spencer charges of falsity.

■ We hold there was ample evidence of guilt on each of the charges. The jury, as we shall later demonstrate, found appellant guilty beyond a reasonable doubt on at least one of those charges.

(2) Here, we shall discuss appellant's contention that he was deprived of a jury trial as guaranteed by the Sixth Amendment because of the alleged failure of the court to instruct the jury that all twelve jurors, before finding a verdict of guilty, must unanimously agree on the falsity of at least one of the statements as charged in the indictment.

The alleged error in the instructions was so discretely concealed that appellant's able counsel failed to discover it when the court was instructing the jury. Moreover, the alleged error continued to escape him on the motion for judgment of acquittal and motion for a new trial. In addition, the alleged error was not raised in appellant's original brief filed in this court. To discover the alleged error, we have to await the searching hindsight of another able lawyer, who prepared and filed the appellant's supplemental brief.

The court's exhaustive instructions to the members of the jury consume fifteen pages of the record. For example, the members were told: (1) not to single out one instruction, but to consider the instructions as a whole; (2) that all instructions were important; (3) that it would be a violation of their sworn duty to base the verdict on any law other than that given to them by the court; (4) the indictment was in one count only; (5) the four essential elements to be proved in order to establish the crime of perjury; (6) that the three particulars in which appellant was alleged to have testified falsely and knowingly, were contained in the single count of the indictment; (7) that the government need only prove, beyond a reasonable doubt, the falsity of one of such particulars in order for the government to sustain its burden of proof; (8) that the government must prove each essential element beyond a reasonable doubt; (9) that in every crime there must exist a union or a joint operation of act and intent with the burden on the prosecution to prove both act and intent beyond a reasonable doubt; and (10) that in order to return a verdict it was necessary for each juror to agree, in other words that their verdict must be unanimous.

■ Implicit in the instructions is a direction to the members of the jury that they could not return a verdict of guilty unless they were unanimous on one or more of the charges of falsity specified in the indictment. Under any reasonable rule of interpretation or construction applied to the instructions, the jury was told that appellant must be acquitted unless the government proved beyond a reasonable doubt to the entire jury that the appellant was guilty of perjury on at least one of the three charges set forth in the indictment.

■ Our whole jury system is based upon the recognized ability of the jury to follow instructions. Opper v. United States, 348 U.S. 84, 95, 75 S.Ct. 158, 99 L.Ed. 101 (1954). Moreover, we must assume that the jury followed the instructions. Cook v. United States, 354 F.2d 529 (9th Cir. 1965); Shotwell Mfg. Co. v. United States, 371 U.S. 341, 83 S. Ct. 448, 9 L.Ed.2d 357 (1963); Fineberg v. United States, 393 F.2d 417 (9th Cir. 1968). We cannot assume or, for that matter, suspect that the jury disregarded the instructions and failed to arrive at a unanimous verdict of guilt on

at least one of the specifications of falsity.

To return a verdict, the jury was required to be unanimous on the appellant's guilt. Under the court's instructions, the only manner in which the jury could arrive at a unanimous verdict was to find guilt beyond a reasonable doubt on one or more of the three specifications of perjury.

In conclusion, on this contention, and after an exhaustive review of the entire record, we can say with fair assurance that the jury's verdict of guilty would not have been different, even though the court had instructed along the lines now suggested by appellant.

Above and beyond everything we have said on the sufficiency of the evidence, and the adequacy of the instructions, is the fact that appellant and his attorney were so satisfied with the fairness of the trial that they neither objected nor excepted, on the submission of the case to the jury, on any of the grounds now urged upon us. Not only did appellant's able trial counsel fail to object, he affirmatively stated that he had no objection to the court's instructions. Appellant was afforded an opportunity to ask the court to enlarge upon, limit or further explain, by appropriate instructions, the areas on which he bases his appeal. Under Rule 30, FRCrimP, he had an absolute right to file written requests asking the court to specifically instruct the jury on any rule of law or issue of fact. Moreover, under the same rule, appellant is precluded from assigning as error any portion of the instructions, *or any omission therefrom,* unless he objected thereto before the jury retired. Additionally, he is required, under the same rule, to distinctly state the matter to which he objects and the grounds of his objection.

■ Apart from the requirements of Rule 30, it is a fundamental rule of practice and procedure that if an objection is not made at the time the evidence is offered and received, its admissibility cannot be challenged on appeal. Marshall v. United States, 409 F.2d 925, 927 (9th Cir. 1969). Here, no objection was made to the introduction of the testimony on "give a bet", nor was there any objection made to the testimony in connection with the common wager placed in the hands of Hughes by appellant, Harrison and the unidentified third person. The case was tried on the theory that "give a bet" was understood by all to mean precisely what they took it to signify at the time of trial.

■ Appellant's contention number V raises the question of whether the court committed error in taking from the jury the question of the scope of the grand jury's investigation. Appellant, before he testified, was informed that the grand jury was inquiring into alleged violations of failure to purchase wager stamps in connection with gambling, failure to pay the 10% excise tax as required by federal law and the illegal interstate transmission of gambling information. The scope of the inquiry, under the provisions of the statute,[5] is not one of the essential elements of the crime. Even if we concede that the scope of the inquiry might be one of the factors going to make the element of materiality, appellant finds himself faced by a formidable line of authority holding that materiality is an issue exclusively for the court. Sinclair v. United States, 279 U.S. 263, 298, 49 S.Ct. 268, 73 L.Ed. 692 (1929); Sigman v. United States, 320 F.2d 176 (9th Cir. 1963).

Appellant's argument is grounded on Luse v. United States, 49 F.2d 241 (9th Cir. 1931). We have no difficulty in differentiating *Luse.* The record in *Luse,* as distinguished from the one before us, did not include a transcript of the grand jury testimony *with a stipulation that the transcript was to be accepted as true by the trial jury.*[6]

Finally, appellant argues that the trial court erred when it ruled, as a matter of law, that appellant's statements before

5. 18 U.S.C. § 1621.

6. T.R.Vol. II, page 14.

the grand jury related to material matters. We call attention to the agreed state of facts on what occurred before the grand jury, including the statement to the appellant on the scope of that body's investigation.[7]

In our view, appellant's contention is grounded on a defective premise. He obviously believes that the false statements must actually impede the grand jury investigation. This is not the law. Carroll v. United States, 16 F. 2d 951, 954 (2d Cir. 1927), cert. denied 273 U.S. 763, 47 S.Ct. 477, 71 L.Ed. 880; Woolley v. United States, 97 F.2d 258, 262 (9th Cir. 1938). Judge Learned Hand, as usual, gives us a definitive statement on the subject in United States v. Siegel, 263 F.2d 530, 533 (2d Cir. 1959), cert. denied 359 U.S. 1012, 79 S.Ct. 1147, 3 L.Ed.2d 1035. After saying, "No matter how right the witness might be in believing that the answer would not contribute to the investigation, he was bound to leave that decision to the tribunal.", he then articulates, "A question is 'material', no matter what the answer may be, unless it appears by its terms that the answer cannot be 'material'." 263 F.2d p. 533. To this language, he later adds: "It is scarcely necessary to add that 'materiality' is always a question for the court." P. 533. Even United States v. Marchisio, 344 F.2d 653, 655 (2d Cir. 1965), cited by appellant, adheres to the same rule, employing, in support, the much read and oft cited champagne bathtub case of Carroll v. United States, *supra,* in which the grand jury was principally concerned with whether a young lady bathed, on stage, in defendant's theatre in a bathtub of champagne or ginger ale, or both. Being during the prohibition era, the grand jury was rightfully and, in our opinion, understandably, concerned with the contents of the bathtub, not excluding the attractive young lady. The court, after an exhaustive analysis of the subject, had no difficulty in concluding that questions relating to the bathing techniques of the young lady in champagne or otherwise, were material as a matter of law. So, too, on the record before us, the lower court correctly ruled, as a matter of law, that the questions propounded to appellant were material.

Other contentions advanced by appellant, such as (1) the weight to be given to the testimony of certain government witnesses, and (2) the effect of the court's instructions on a delayed offer to retract a portion of the testimony before the grand jury, are so completely without substance they do not warrant discussion.

A careful examination of the entire record convinces us that appellant had a fair trial, which was conducted impartially and without irregularities or defects in any way affecting his substantial rights. Moreover, the case was submitted to the jury under instructions everyone understood at that time.

Of course, in our discretion, we have the power under Rule 52(b), FRCrimP, where it appears necessary in order "to prevent miscarriage of justice, or to preserve the integrity and reputation of the judicial process," to recognize plain error. We find nothing in this record which would lead us to believe that appellant has been victimized in the administration of justice or has not had a fair trial. Nowhere in the record do we find that one incident, or group of circumstances, which might invite us to recognize plain error under 52(b). As we view it, any possible defects or irregularities occurring during the course of the trial did not affect the substantial rights of the appellant and should be disregarded pursuant to the provisions of Rule 52(a), FRCrimP.

Affirmed.

ELY, Circuit Judge (dissenting):

I respectfully dissent. In the first place, I entertain grave doubts that the evidence was sufficient to sustain con-

viction. The indictment was predicated upon three alleged perjurious answers given by the accused during his interrogation before a grand jury. At its best, the English language is often imprecise, and it seems to me that one should not be indicted for perjury as a result of answers given to questions characterized by any ambiguity whatsoever.

One of the questions put to Vitello was whether he had "placed a wager" with Ruth Hughes. The Government admits that this form of question is reasonably susceptible to at least two opposing interpretations—i. e., whether he had given her money to be transmitted to someone else or whether he had actually bet with her personally on the outcome of a particular race. Since Vitello was led to believe, in the questioning regarding Harrison, that "place a wager" referred to employing another as an intermediary with the ultimate bookmaker, it may well be assumed that he continued to have this interpretation in mind when asked about Ruth Hughes.[1] Thus, his answer as to Hughes could have been truthful, based on the fact that he had bet personally with her but had not intended to employ her as an intermediary. This explanation could also reasonably account for his negative answer to the question of whether he had ever "placed a bet" with anyone other than Harrison. I therefore submit that the original interrogator did not employ that caution and precision which should be demanded of an interrogator when subsequent charges of perjury are either then contemplated or may possibly be predicated upon the answers to the questions.

The third alleged perjurious statement, a negative answer to the question whether he knew anyone named Charles Otis Spencer, is of a type that should hardly justify conviction unless the prosecution clearly proves that the defendant, when he gave his answer, actually knew the particular individual by that particular name. Here, it was not established that, at the time of his questioning, the man whom Vitello knew as "Spence" was in fact Charles Otis Spencer and so known by Vitello. In Whaley v. United States, 362 F.2d 938 (9th Cir. 1966), we reversed a conviction for perjury in almost identical circumstances.

While I would, if permitted to act alone, reverse this particular judgment of conviction for the above stated reasons, my principal objection to the majority opinion is the portion thereof which deals with the issue of the appellant's Sixth Amendment rights. As pointed out, the indictment was framed in one count, alleging that Vitello had perjured himself in three particulars. The jury was instructed in general terms that it could not return a verdict of guilty without unanimity of opinion. It was not, however, advised, either directly or indirectly, that it must reach unanimity of opinion of falsity in at least one particular answer among the three set forth in the indictment. It seems clear to me that the jury could have believed, under the instruction giv-

---

1. I cannot accept the majority's casual treatment of the question of whether Vitello could have fully understood the questions before the grand jury. When the subject of "place a wager" first came up, the interrogation was as follows:

"Q. Have you ever placed a wager on a horse race with Mr. Harrison?

"A. Well—that would be indefinite. With Mr. Harrison, no. If he—

"You—

"A. —he may have carried a bet for me to someone else.

"Q. Let me put it this way: Did you ever give Mr. Harrison a bet on a horse race? Whether or not he kept the ac- tion himself or gave it to someone else we are not yet concerned with.

"A. Yes, I have."

The confusion demonstrated by this exchange certainly must have carried over to the questioning concerning Ruth Hughes. Moreover, despite the majority's assertion that Vitello never once claimed to have misunderstood the questions, the record of the trial testimony is replete with efforts by Vitello, as well as by both prosecution and defense counsel and the court, to draw distinctions between the various ways in which bets could be placed and between the various ways in which Vitello had actually placed bets.

en, that it could return a verdict of guilty if each of the jurors found that there was perjury on one or more of the answers, without regard to whether they all agreed that at least one of the answers was perjurious. For example, six jurors could have believed that perjury had been committed in the first answer, while five believed that perjury had been committed by the second answer only and the remaining juror believed that perjury had been committed only as to the third answer. The instruction given by the trial court would enable the jury to find the defendant guilty in any such combination of jurors' opinions. Since we are unable to determine from the general verdict upon what ground the jurors reached their conclusion, the judgment of conviction should be vacated. *See* Yates v. United States, 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957); Cramer v. United States, 325 U.S. 1, 36, n. 45, 65 S.Ct. 918, 89 L.Ed. 1441 (1945).

I would reverse.