**UNITED STATES of America,
Appellee,**

v.

**Anthony M. NATELLI and Joseph
Scansaroli, Defendants-Appellants.**

**Nos. 1035, 1036, Dockets 75–1004,
75–1008.**

United States Court of Appeals,
Second Circuit.

Argued April 10, 1975.

Decided July 28, 1975.

On Rehearing Oct. 7 and Dec. 4, 1975.
Certiorari Denied April 19, 1976
See 96 S.Ct. 1663.

John S. Martin, Jr., New York City (Martin, Obermaier &amp; Morvillo, New York City, Philip A. Lacovara, Washington, D. C., Betty J. Santangelo, New York City, and Hughes, Hubbard &amp; Reed, Washington, D. C., of counsel), for defendant-appellant Natelli.

Charles A. Stillman, New York City (Morrison, Paul, Stillman &amp; Beiley, Peter H. Morrison, Benjamin Zelermyer and Edward D. Tanenhaus, New York City, of counsel), for defendant-appellant Scansaroli.

Franklin B. Velie, Asst. U. S. Atty., New York City (Paul J. Curran, U. S.

Atty., and Jed S. Rakoff, Audrey Strauss and John D. Gordan, III, Asst. U. S. Attys., of counsel), for appellee.

Victor M. Earle, III, and Cahill Gordon & Reindel (Howard J. Krongard, William E. Hegarty, Mathias E. Mone, George Wailand, New York City, of counsel), for Peat, Marwick, Mitchell & Co. as amicus curiae.

Cravath, Swaine & Moore, New York City (John R. Hupper, Robert Rosenman and J. Barclay Collins, New York City, of counsel), for American Institute of Certified Public Accountants as amicus curiae.

Before HAYS, MULLIGAN and GURFEIN, Circuit Judges.

GURFEIN, Circuit Judge:

Anthony M. Natelli and Joseph Scansaroli appeal from judgments of conviction entered in the United States District Court for the Southern District of New York on December 27, 1974 after a four week trial before the Hon. Harold R. Tyler and a jury. Judge Tyler imposed a one year sentence and a $10,000 fine upon Natelli, suspending all but 60 days of imprisonment, and a one year sentence and a $2,500 fine upon Scansaroli, suspending all but 10 days of the imprisonment.

Both appellants are certified public accountants. Natelli was the partner in charge of the Washington, D. C. office of Peat, Marwick, Mitchell & Co. ("Peat"), a large independent firm of auditors, and the engagement partner with respect to Peat's audit engagement for National Student Marketing Corporation ("Marketing"). Scansaroli was an employee of Peat, assigned as audit supervisor on that engagement.

Appellants were charged and tried only on Count Two of a multi-count indictment against other defendants connected with Marketing.

Count Two of the indictment charged that, in violation of Section 32(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78ff(a),[1] four of Marketing's officers and the appellants, as independent auditors, "wilfully and knowingly made and caused to be made false and misleading statements with respect to material facts" in a proxy statement for Marketing dated September 27, 1969 and filed with the Securities and Exchange Commission (SEC) in accordance with Section 14 of the 1934 Act, 15 U.S.C. § 78n.

The proxy statement was issued by Marketing in connection with a special meeting of its stockholders to consider *inter alia* a charter amendment increasing its authorized capital stock and the merger of six companies, including Interstate National Corporation ("Interstate") into Marketing.

Count Two of the indictment further charged that appellants, in attempting to reconcile net sales and earnings as originally reported in the annual report for the fiscal year ending August 31, 1968 with the amounts shown in the statement of earnings in the proxy statement, filed less than a year later, created an explanatory footnote that was materially false and misleading.[2] It was alleged

---

1. Section 32(a) provides in relevant part:

"Any *person . . . who willfully and knowingly makes, or causes to be made, any statement in any application, report, or document required to be filed under this chapter or any rule or regulation thereunder* or any undertaking contained in a registration statement as provided in subsection (d) of section 78o of this title, *which statement was false or misleading with respect to any material fact*, shall upon conviction be fined not more than $10,000, or imprisoned not more than two years, . . . ." (Emphasis added.)

2. The footnote read in relevant part:

"Net sales and earnings as originally reported to stockholders in the annual report [for the year 1968] and the amounts as shown in the statement of earnings in this proxy statement are reconciled as follows:

| Net sales | 1968 |
|---|---|
| Originally reported | $ 4,989,446 |
| Pooled companies reflected retroactively | 6,552,449 |
| Per statement of earnings | $11,541,895 |

| Net earnings | |
|---|---|
| Originally reported | $ 388,031 |
| Pooled companies reflected retroactively | 385,121 |
| Per statement of earnings | $ 773,152" |

that "as the defendants well knew but failed to disclose . . . (a) approximately one million dollars, or more than 20%, of the 1968 'net sales originally reported' had proven to be nonexistent by the time the proxy statement was filed and had been written off on [Marketing's] own internal books of account; (b) net sales and profits of 'pooled companies reflected 'retroactively' were substantially understated; and (c) net sales and profits of [Marketing] were substantially overstated."

Count Two charged further ·that the proxy statement also contained an unaudited statement of earnings for the nine months ended May 31, 1969 which was materially false and misleading in that it stated "net sales" as $11,313,569 and "net earnings" as $702,270, when, in fact, as the defendants well knew, "net sales" for the period were less than $10,500,000 and Marketing had no earnings at all.

In order to understand the theory of the government's case, we must retrace our steps to the beginning of the Peat engagement at Marketing. The jury could permissibly have found the following facts.

Marketing was formed in 1966 by Cortes W. Randell. It provided to major corporate accounts a diversified range of advertising, promotional and marketing services designed to reach the youth market. In April 1968 Marketing had its first and only public offering of stock. Peat was not its auditor at the time.

Peat took on the engagement in August 1968 after checking with the previous auditors that there had been no professional disagreement with management. Natelli, the partner in charge of Peat's Washington office, undertook the engagement to audit the financial statements of Marketing for the fiscal year ended August 31, 1968, and Natelli assigned Scansaroli to serve as supervisor on the engagement.

In late September or early October 1968 (after the close of the fiscal year), Randell and Bernard Kurek, Marketing's Comptroller, met with both appellants and discussed the method of accounting that Marketing had been using with respect to fixed-fee programs. In the fixed-fee program, Marketing would develop overall marketing programs for the client to reach the youth market by utilizing a combination of the mailings, posters and other advertising services offered by Marketing. Randell explained that Marketing and the client agreed upon a fixed fee to be charged for participating in the various programs. Randell stated that the company believed that it was proper to recognize income on these fixed-fee contracts at the time the clients committed themselves to participate in the programs presented to them by the account executives, and that this was the accounting method that had been used in preparing the financial statements for the period ended May 31, 1968, which had been distributed to stockholders.

After considering alternative methods of accounting, Natelli concluded that he would use a percentage-of-completion approach to the recognition of income on these commitments, pursuant to which the company would accrue that percentage of the gross income and related costs on a client's "commitment" that was equal to the proportion of the time spent by the account executive on the project before August 31, 1968 to the total time it was estimated he would have to spend to complete the project.

The difficulty immediately encountered was that the "commitments" had not been booked during the fiscal year, and were not in writing. The Marketing stock which had initially been sold at $6 per share was selling in the market by September 1968 for $80, an increase of $74 in five months. A refusal to book the oral "commitments" would have resulted in Marketing's showing a large loss for the fiscal year—according to Kurek's computations, a loss of $232,000.

Scansaroli, upon Natelli's order, attempted to verify the "commitments," the sales not previously included in the company records, in a rather haphazard

manner by telephone to representatives of companies which had purportedly indicated some intent to use Marketing's services. Pursuant to Randell's urging, Scansaroli did not seek any written verifications. He accepted a schedule prepared by Kurek which showed about $1.7 million in purported "commitments." He also received from the account executives forms indicating estimates of the gross amount of the client's commitment, the printing and distribution costs to be incurred on the program, and the account executive's estimate of the percentage of completion of the program.

On the basis of the above, Natelli decided not only to recognize income on a percentage-of-completion basis, but to permit adjustment to be made on the books after the close of the fiscal year in the amount of $1.7 million for such "unbilled accounts receivable." This adjustment turned the loss for the year into a handsome profit of $388,031, showing an apparent doubling of the profit of the prior year.

Appellants were not charged with a criminal violation with respect to this decision. It may be observed, however, that in the footnote to the audited financial statement for 1968 explaining this method of accounting for "Contracts in Progress," no indication is given of the flimsy nature of the evidence that such client "commitments" actually existed.

After the 1968 audit had been given a full certificate by the auditors on November 14, 1968, Natelli in December 1968 told the officers of Marketing that in the future Peat would allow income to be recorded only on written commitments, supported by contemporaneous logs kept by the account executives with respect to each contract. A form letter was drafted to spell out a binding contractual commitment to be signed by each client.

In the meantime, following the issuance of the 1968 audited annual report and before the September 1969 proxy statement, seven companies were acquired largely in exchange for Marketing stock, in reliance on the 1968 annual report.

Things began to happen with respect to the $1.7 million of "sales" that had been recorded as income after fiscal year end. Within five months of publication of the annual report, by May 1969, Marketing had written off over $1 million of the $1.7 million in "sales" which the auditors had permitted to be booked.

Of the total $1 million written off, $748,762 was attributable to "sales" purportedly made by one Ronald Michaels, an account executive who was fired for taking kickbacks and who was said to be dishonest. The other quarter of a million dollars of sales written off had nothing to do with Michaels. When accrued costs were taken into account, the effect of the write-off of the Michaels contracts was to reduce 1968 income by $209,750. It appeared that of the $1 million of sales requiring retroactive write-off, $350,000 had already been written off by the company by subtracting these "sales" from 1969 *current* year figures. An additional $678,000 was to be written off sales for the prior year 1968, and appellants were asked to design the write-off. The write-off suggested by appellants was accepted and entered in the general ledger as a journal voucher entry sometime in late April or early May.

That entry wrote off the $678,000 retroactively as a deduction from 1968 sales. Instead of reducing 1968 earnings commensurately, however, no such reduction was made. Appellants were informed by tax accountants in Peat's employ that a certain deferred tax item should be reversed, resulting in a tax credit that happened to be approximately the same amount as the profit to be written off. Scansaroli "netted" this extraordinary item (the tax credit) with an unrelated ordinary item (the write-off of sales and profits). By this procedure he helped to conceal on the books the actual write-off of profits, further using the device of rounding off the tax item to make it conform exactly to the

write-off.[3] The effect of the netting procedure was to bury the retroactive adjustment which should have shown a material decrease in earnings for the fiscal year ended August 31, 1968.

### The Proxy Statement

#### A. The Footnote

As part of the proxy statement, appellants set about to draft a footnote purporting to reconcile the Company's prior reported net sales and earnings from the 1968 report with restated amounts resulting from pooled companies reflected retroactively. The earnings summary in the proxy statement included companies acquired after fiscal 1968 and their pooled earnings. The footnote was the only place in the proxy statement which would have permitted an interested investor to see what Marketing's performance had been in its preceding fiscal year 1968, as retroactively adjusted, separate from the earnings and sales of the companies it had acquired in fiscal 1969.[4]

At Natelli's direction, Scansaroli subtracted the written-off Marketing sales from the 1968 sales figures for the seven later acquired pooled companies without showing any retroactive adjustment for Marketing's own fiscal 1968 figures. There was no disclosure in the footnote that over $1 million of previously reported 1968 sales of Marketing had been

written off. All narrative disclosure in the footnote was stricken by Natelli. This was a violation of Accounting Principles Board Opinion Number 9, which requires disclosure of prior adjustments which affect the net income of prior periods.[5]

#### B. The False Nine-Months Earnings Statement

The proxy statement also required an unaudited statement of nine months earnings through May 31, 1969. This was prepared by the Company, with the assistance of Peat on the same percentage of completion basis as in the 1968 audited statement. A commitment from Pontiac Division of General Motors amounting to $1,200,000 was produced two months after the end of the fiscal period. It was dated April 28, 1969.

The proxy statement was to be printed at the Pandick Press in New York on August 15, 1969. At about 3 A.M. on that day, Natelli informed Randell that the "sale" to the Pontiac Division for more than $1 million could not be treated as a valid commitment because the letter from Pontiac was not a legally binding obligation. Randell responded at once that he had a "commitment from Eastern Airlines" in a somewhat comparable amount attributable to the nine months fiscal period (which had ended more than two months earlier). Kelly, a

---

3. This procedure was approved by Natelli, for in the first printed draft of the proxy statement he prepared a footnote which lumped contract losses for 1968 and the tax adjustment, stating that "the net effect of the retroactive adjustment was a $21,000 decrease in net earnings for the year 1968."

4. A vigilant and knowledgeable stockholder who had saved his 1968 financial report could have discovered, by matching it with the balance sheet in the proxy statement, that unbilled receivables for the year ended August 31, 1968 were now $1,015,230 as against $1,763,992 in the earlier document, but he would not know why there was a difference. Footnote "c" read: "Figures for 1968 have been restated in certain instances to make their presentation consistent with current accounting practices. There was no material effect as a result of such restatement."

5. Accounting Principles Board Opinion Number 9, issued December, 1966, reads in relevant part:

"26. When prior period adjustments are recorded, the resulting effects (both gross and net of applicable income tax) on the net income of prior periods should be disclosed in the annual report for the year in which the adjustments are made. [The Board recommends disclosure, in addition, in interim reports issued during that year subsequent to the date of recording the adjustments.] When financial statements for a single period only are presented, this disclosure should indicate the effects of such restatement on the balance of retained earnings at the beginning of the period and on the net income of the immediately preceding period."

APB Accounting Principles: Original Pronouncements, Vol. 2, p. 6562 (1969).

salesman for Marketing, arrived at the printing plant several hours later with a commitment letter from Eastern Airlines, dated August 14, 1969, purporting to confirm an $820,000 commitment ostensibly entered into on May 14, just before the end of the nine-month fiscal period of September 1, 1968 through May 31, 1969. When the proxy statement was printed in final form, the Pontiac "sale" had been deleted, but the Eastern "commitment" had been inserted in its place.

Soon after the incident at Pandick Press, Douglas Oberlander, an accountant at Peat assigned by Natelli to review Marketing's accounts, discovered $177,547 worth of "bad" contracts from 1968 which were known to Scansaroli in May as doubtful, but which had not been written off. Oberlander suggested to Kurek that these contracts and others amounting to over $320,000, in addition to the $1 million in bad contracts previously disposed of, be written off. Kurek consulted Scansaroli, who, after consulting with Natelli, decided against the suggested write-off.

The proxy statement was filed with the SEC on September 30, 1969. There was no disclosure that Marketing had written off $1 million of its 1968 sales (over 20%) and over $2 million of the $3.3 million in unbilled sales booked in 1968 and 1969. A true disclosure, which was not made, would have shown that without these unbilled receivables, Marketing had no profit in the first nine months of 1969.

Each appellant contends that the evidence was insufficient to support his conviction. We shall consider each appellant separately.[6]

## I

### Natelli—Sufficiency of Evidence

It is hard to probe the intent of a defendant. Circumstantial evidence, particularly with proof of motive, where available, is often sufficient to convince a reasonable man of criminal intent beyond a reasonable doubt. When we deal with a defendant who is a professional accountant, it is even harder, at times, to distinguish between simple errors of judgment and errors made with sufficient criminal intent to support a conviction, especially when there is no financial gain to the accountant other than his legitimate fee.

Natelli argues that there is insufficient evidence to establish that he knowingly assisted in filing a proxy statement which was materially false. After searching consideration, we are constrained to find that there was sufficient evidence for his conviction.

The arguments Natelli makes in this court as evidence of his innocent intent were made to the jury and presented fairly. There is no contention that Judge Tyler improperly excluded any factual evidence offered. While there is substance to some of Natelli's factual contentions for jury consideration, we cannot find, on the totality of the evidence, that he was improperly convicted.

6. Natelli contends that a later incident reveals his lack of intent to deceive. In September 1969, John Johnston, a staff accountant with Peat, was assigned to prepare the audit of Marketing's books for the fiscal year ended August 31, 1969. He discovered the uncollectible contracts found by Oberlander in August and reported them to his superior, William Colona, who had replaced Scansaroli as audit supervisor when Scansaroli joined Marketing as an employee in October. Later in October, Peat was asked to prepare a "comfort letter" in connection with Marketing's acquisition of Interstate National Corporation, to assure Interstate that no adverse information concerning the unaudited statements for the period ended May 31, 1969 had been discovered since the acquisition contract had been signed in August. Colona and Johnston drafted a "comfort letter" noting adjustments which completely wiped out Marketing's first three-quarter earnings for 1969 of $700,000 as they had been carried in the proxy statement. Natelli acquiesced. The draft "comfort letter" did not deter Interstate from closing the transaction, and Peat decided, at the suggestion of Natelli, to send the letter to the other companies being acquired, which had failed to require such a "comfort letter" in their contracts. Natelli urged this at trial as proof of his good faith, and the trial judge fairly stated to the jury his contention in that regard.

The original action of Natelli in permitting the booking of unbilled sales after the close of the fiscal period in an amount sufficient to convert a loss into a profit was contrary to sound accounting practice, particularly when the cost of sales based on time spent by account executives in the fiscal period was a mere guess. When the uncollectibility, and indeed, the non-existence of these large receivables was established in 1969, the revelation stood to cause Natelli severe criticism and possible liability. He had a motive, therefore, intentionally to conceal the write-offs that had to be made.

Whether or not the deferred tax item was properly converted to a tax credit, the jury had a right to infer that "netting" the extraordinary item against ordinary earnings on the books in a special journal entry was, in the circumstances, motivated by a desire to conceal.

With this background of motive, the jury could assess what Natelli did with regard to (1) the footnote and (2) the Eastern commitment and the Oberlander "bad" contracts.

### A. The Footnote

Honesty should have impelled appellants to disclose in the footnote which annotated their own audited statement for fiscal 1968 that substantial write-offs had been taken, after year end, to reflect a loss for the year. A simple desire to right the wrong that had been perpetrated on the stockholders and others by the false audited financial statement should have dictated that course. The failure to make open disclosure could hardly have been inadvertent, or a jury at least could so find, for appellants were themselves involved in determining the write-offs and their accounting treatment. The concealment of the ret-

roactive adjustments to Marketing's 1968 year revenues and earnings could properly have been found to have been intentional for the very purpose of hiding earlier errors.[7] There was evidence that Natelli himself changed the footnote to its final form.

That the proxy statement did not contain a formal reaudit of fiscal 1968 is not determinative. The accountant has a duty to correct the earlier financial statement which he had audited himself and upon which he had issued his certificate, when he discovers "that the figures in the annual report were substantially false and misleading," and he has a chance to correct them. See *Fischer v. Kletz*, 266 F.Supp. 180, 183 (S.D.N.Y.1967) (Tyler, J.). See also *Gold v. DCL Inc.*, 399 F.Supp. 1123 (S.D.N.Y. 1973) (Frankel, J.). The accountant owes a duty to the public not to assert a privilege of silence until the next audited annual statement comes around in due time. Since companies were being acquired by Marketing for its shares in this period, Natelli had to know that the 1968 audited statement was being used continuously.

The argument that the disclosure was not material is weak, since applying write-offs only against pooled earnings, without further explanation, conceals the effect of the write-offs on the prior reported earnings of the principal company. It is the disclosure of the true operating results of Marketing for 1968, now come to light, that was material. Materiality is an objective matter, not necessarily limited by the accountant's own uncontrolled subjective estimate of materiality, see *United States v. Simon*, 425 F.2d 796, 806 (2 Cir. 1969), *cert. denied*, 397 U.S. 1006, 90 S.Ct. 1235, 25 L.Ed.2d 420 (1970). In any event, the court

---

7. Natelli contends that the write-offs were of sales of Michaels, an allegedly corrupt salesman, and that since Michaels had been fired, the problem was not likely to recur. But the Government proved that at a meeting on June 9, 1969, at which Natelli was present, the Controller produced charts showing that of the

$1.5 million of 1968 sales analyzed, about $900,000 had been written off. Of these, about $700,000 were sales of Michaels; $200,000 were of another salesman, Ganis. (In addition, a third salesman had accounted for $213,000 of the 1968 sales, not a dollar of which had yet been billed).

charged that the earnings figures would have to be "known to be false in a material way"—a subjective test.

## B. *The Eastern Commitment and the Nine-Months Earnings Statement*

The Eastern contract was a matter for deep suspicion because it was substituted so rapidly for the Pontiac contract to which Natelli had objected, and which had, itself, been produced after the end of the fiscal period, though dated earlier. It was still another unbilled commitment produced by Marketing long after the close of the fiscal period. Its spectacular appearance, as Natelli himself noted at the. time, made its replacement of the Pontiac contract "weird." [8] The Eastern "commitment" was not only in substitution for the challenged Pontiac "commitment" but strangely close enough in amount to leave the projected earnings figures for the proxy statement relatively intact. Marketing had only time logs of a salesman relating to the making of the proposals but no record of expenditures on the Eastern "commitment," no record of having ever billed Eastern for services on this "sale," and not one scrap of paper from Eastern other than the suddenly-produced letter. Nevertheless, it was booked as if more than $500,000 of it had already been earned.

Natelli contends that he had no duty to verify the Eastern "commitment" because the earnings statement within which it was included was "unaudited."

■■■ This raises the issue of the duty of the CPA in relation to an unaudited financial statement contained within a proxy statement where the figures are reviewed and to some extent supplied by the auditors. It is common ground that the auditors were "associated" with the statement and were required to object to anything they actually "knew" to be materially false. In the ordinary case involving an unaudited statement, the auditor would not be chargeable simply be-

cause he failed to discover the invalidity of booked accounts receivable, inasmuch as he had not undertaken an audit with verification. In this case, however, Natelli "knew" the history of post-period bookings and the dismal consequences later discovered. Was he under a duty in these circumstances to object or to go beyond the usual scope of an accountant's review and insist upon some independent verification? The American Institute of Certified Public Accountants, Statement of Auditing Standards No. 1—Codification of Auditing Standards and Procedures (1972), 1 CCH AICPA Professional Standards § 516.00, recognizes that "if the certified public accountant concludes in the basis of facts known to him that unaudited financial statements with which he may become associated are not in conformity with generally accepted accounting principles, *which include adequate disclosure*, he should insist . . . upon appropriate revision . . . " (emphasis added).

We do not think this means, in terms of professional standards, that the accountant may shut his eyes in reckless disregard of his knowledge that highly suspicious figures, known to him to be suspicious, were being included in the unaudited earnings figures with which he was "associated" in the proxy statement.

The auditor's duty is not as restricted as appellants urge where, as here, the auditors, rather than the company, controlled the figures, as is evidenced by Natelli's rejection of the Pontiac contract as one he would not accept for the subsequent audited financial statement for 1969, and where the erroneous figures had previously been certified by his firm. Cf. *Fischer v. Kletz, supra,* 266 F.Supp. at 188, 189 (S.D.N.Y.1967). We reject the argument of insufficiency as to Natelli, who could have pointed out the error of his previous certification and deliberately failed to do so, our

---

8. Natelli's explanation that only the suggestion of Randell for *complete* replacement of the Pontiac contract, *without changing the figures* *at all,* was "weird" is not convincing. Certainly the jury could find otherwise.

function being limited to determining whether the evidence was sufficient for submission to the jury. *United States v. Simon, supra,* 425 F.2d at 799. We hold that it was. We discuss the objections to the charge below.

There are points in favor of Natelli, to be sure, but these were presented to the jury and rejected. These included, with their counterbalance: his rejection of the .Pontiac commitment (with substitution of the Eastern contract); his discussion of the footnote with his superior, Leon Otkiss (without full disclosure to Otkiss of all relevant factors); his insistence on dissemination of the comfort letter (See note 6) (but his failure to disclose the huge past write-offs of Marketing resulting in no profit for 1968 or nine months of 1969).

## II

### *Scansaroli—Sufficiency of Evidence*

The claim of Scansaroli with respect to insufficiency of the evidence is somewhat more difficult. As Judge Tyler noted after both sides had rested, "It is a close question, I think frankly as to Scansaroli, as I see it. Certainly if I were the factfinder, I would be more troubled with his case for a variety of reasons."

Scansaroli contends that there was insufficient evidence to prove beyond a reasonable doubt that (1) he participated in a criminal act with respect to the footnote or (2) that he made an accounting judgment permitting Marketing to include in sales certain contracts-in-progress with the requisite criminal intent. We hold that there was enough evidence to establish the former, but not the latter. For reasons relating to the form of the charge, we will reverse and remand for a new trial.

### A. *The Footnote*

The essence of Scansaroli's argument on his conviction with respect to the false footnote is that he was really convicted for his conduct during the 1968 audit, for which he was not indicted.

This misses the thrust of the Government's claim. The unjustifiable manner of treating the unbilled commitments in the 1968 audit bore upon the illegal acts connected with the 1969 proxy statement in two ways: (a) it created a motive to conceal the accounting errors made in the 1968 audit; and (b) the 1968 audited statement was part of the 1969 proxy statement and was not disclosed therein to have been wrong in the light of the subsequent known write-offs. In view of the established motive to conceal, the jury could properly find, as we have seen, that both the netting of the tax credit against earnings and the subsequent subtracting of the write-offs from the pooled earnings in the footnote without further explanation were done in order to conceal the true retroactive decrease in the Marketing earnings for fiscal 1968.

There is some merit to Scansaroli's point that he was simply carrying out the judgments of his superior Natelli. The defense of obedience to higher authority has always been troublesome. There is no sure yardstick to measure criminal responsibility except by measurement of the degree of awareness on the part of a defendant that he is participating in a criminal act, in the absence of physical coercion such as a soldier might face. Here the motivation to conceal undermines Scansaroli's argument that he was merely implementing Natelli's instructions, at least with respect to concealment of matters that were within his own ken.

We think the jury could properly have found him guilty on the specification relating to the footnote. Scansaroli himself wrote the journal entry in Marketing's books which improperly netted the tax credit with earnings, the true effect never being pointed out in the financial statement. This, with the background of Scansaroli's implication in preparation of the 1968 statement, could be found to have been motivated by intent to conceal the 1968 overstatement of earnings.

Scansaroli participated in the decision to subtract in the proxy statement foot-

note $678,000 of written-off Marketing sales from the figures for later-acquired pooled companies instead of from its own figures, without further disclosure. Even if Scansaroli did not write the footnote, he supplied the misleading computations and subtractions though he was conscious of the true facts.

## B. *The Eastern Commitment*

Having concluded that there was sufficient evidence to convict both appellants on the footnote specification, we turn to the nine-months earnings statement which, in turn, included two items, the Eastern contract and the doubtful commitments discovered by Oberlander. We put aside the decision to ignore Oberlander's questioning of certain commitments on the ground that, if it stood alone, the evidence would have been too equivocal to support proof beyond a reasonable doubt that this was not a mere error of judgment.

With respect to the major item, the Eastern commitment, we think Scansaroli stands in a position different from that of Natelli. Natelli was his superior. He was the man to make the judgment whether or not to object to the last-minute inclusion of a new "commitment" in the nine-months statement. There is insufficient evidence that Scansaroli engaged in any conversations about the Eastern commitment at the Pandick Press or that he was a participant with Natelli in any check on its authenticity. Since in the hierarchy of the accounting firm it was not his responsibility to decide whether to book the Eastern con-

tract, his mere adjustment of the figures to reflect it under orders was not a matter for his discretion. As we have seen, Natelli bore a duty in the circumstances to be suspicious of the Eastern commitment and to pursue the matter further. Scansaroli may also have been suspicious, but rejection of the Eastern contract was not within his sphere of responsibility. Absent such duty, he cannot be held to have acted in reckless disregard of the facts.

## III

■ Appellants contend that the trial court erroneously instructed the jury on the issue of knowledge. We do not agree.

The thrust of appellants' argument, as we understand it, is that the judge charged that each appellant could be convicted "if [his] failure to discover the falsity of [Marketing's] financial statements was the result of some form of gross negligence." We do not read the charge that way. It followed the charge of Judge Mansfield which was sustained in *United States v. Simon, supra.*[9]

It was a balanced charge which made it clear that negligence or mistake would be insufficient to constitute guilty knowledge. *See United States v. Bright,* 517 F.2d 584 (2 Cir. 1975). Judge Tyler also carefully instructed the jury that "good faith, that is to say, an honest belief in the truth of the data set forth in the footnote and entries in the proxy statement, would constitute a complete defense here." On the other hand, "Con-

---

**9.** Judge Tyler charged, in pertinent part, as follows:

"While I have stated that negligence or mistake do not constitute guilty knowledge or intent, nevertheless, ladies and gentlemen, you are entitled to consider in determining whether a defendant acted with such intent if he deliberately closed his eyes to the obvious or to the facts that certainly would be observed or ascertained in the course of his accounting work or whether he recklessly stated as facts matters of which he knew he was ignorant.

If you find such reckless deliberate indifference to or disregard for truth or falsity on

the part of a given defendant, the law entitles you to infer therefrom that that defendant wilfully and knowingly filed or caused to be filed false financial information of a material nature with the SEC.

But such an inference, of course, must depend upon the weight and credibility extended to the evidence of reckless and indifferent, conduct, if any.

I repeat: Ordinary or simple negligence or mistake alone would be insufficient to support a finding of guilty knowledge or wilfulness or intent."

gress equally could not have intended that men holding themselves out as members of these ancient professions [law and accounting] should be able to escape criminal liability on a plea of ignorance when they have shut their eyes to what was plainly to be seen or have represented a knowledge they knew they did not possess." *United States v. Benjamin*, 328 F.2d 854, 863 (2 Cir.), *cert. denied sub nom. Howard v. United States*, 377 U.S. 953, 84 S.Ct. 1631, 12 L.Ed.2d 497 (1964); and *see United States v. Brawer*, 482 F.2d 117, 128–29 (2 Cir. 1973).

One of the bases for attack on the charge is that in charging "reckless disregard for the truth or falsity" or "closing his eyes," there must also be an instruction like "and with a conscious purpose to avoid learning the truth."

■ It is true that we have favored this charge in false statement cases, *United States v. Sarrantos*, 455 F.2d 877, 880–82 (2 Cir. 1972), while noting that both phrases "mean essentially the same thing," *id.* at 882; and in cases involving knowledge that goods were stolen, *United States v. Brawer, supra*, 482 F.2d at 128–29 (2 Cir. 1973); *United States v. Jacobs*, 475 F.2d 270, 287 (2 Cir.), *cert. denied*, 414 U.S. 821, 94 S.Ct. 116, 38 L.Ed.2d 53 (1973). The dual instruction is not necessarily required, however, when the defendant is under a specific duty to discover the true facts, the facts tendered are suspect, and he does nothing to correct them. In *United States v. Benjamin, supra*, 328 F.2d at 862, this court said, regarding an accountant, that "the Government can meet its burden by proving that a defendant deliberately closed his eyes to facts he had a duty to see." And *United States v. Simon, supra*, which affirmed the conviction of an accountant, as we have seen, sustained a charge in the very language Judge Tyler tracked.

While the facts in each case are not precisely the same, we think this appeal quite analogous to *Simon, supra*, because Natelli was suspicious enough of the Eastern contract to check it with Kelly, the account executive in house, but not to take the next step of seeking verification from Eastern, despite his obvious doubt that it could be booked as a true commitment. And with respect to the footnote, we think the language of this court in *Simon* to be quite pertinent, "The jury could reasonably have wondered how accountants who were really seeking to tell the truth could have constructed a footnote so well designed to conceal the shocking facts." 425 F.2d at 807.

Appellants argue strenuously, however, that *United States v. Simon, supra*, involved an audited statement while the nine months statement here involved was an unaudited statement, and that, hence, the duties of appellants here were different from those enunciated in *Simon*. They urge as a corollary that the District Court failed to instruct the jury on the difference, and that his failure to do so was reversible error.

It is true that the point on appeal might have been eliminated if the judge had charged on the differences in the abstract. But in the circumstances he was not required to do so. As we have seen, *supra*, Point I, the duty of Natelli, given this set of facts, was not so different from the duty of an accountant upon an audit as to require sharply different treatment of that duty in the charge to the jury.

■ We agree with Judge Tyler when he charged the jury that they could find Natelli "knew" of the falsely material fact if he acted in "reckless disregard" or deliberately closed his eyes to the obvious. The issue on this appeal is not what an auditor is *generally* under a duty to do with respect to an unaudited statement, but what these defendants had a duty to do in these unusual and highly suspicious circumstances. Cf. *United States v. Simon, supra*, 425 F.2d at 806–07. Nor was a proper charge requested.

■ The duly requested supplemental charge on Natelli's duty with respect to

the unaudited earnings statement was properly denied. It read:

"The defendants' *only* responsibility as to this statement [unaudited statement of earnings for the nine months ended May 31, 1969] was to be satisfied that, *as far as they knew*, the statement contained no misstatement of material facts." (emphasis added).

This requested charge was not correct, for even on an unaudited statement with which Natelli was "associated" and where there were suspicious circumstances, his duty went further, as we have seen. As the court correctly charged, Natelli was culpable if he acted in "reckless disregard" of the facts or if he "deliberately closed his eyes."

We expound no rule, to be sure, that an accountant in reviewing an unaudited company statement is bound, without more, to seek verification and to apply auditing procedures. We lay no extra burden on the normal activities of accountants, nor do we assume the role of an Accounting Principles Board. We deal only with such deviations as fairly come within the common understanding of dishonest conduct which jurors bring into the box as applied to the particular conduct prohibited by the particular statute.

It was not for Judge Tyler in his instructions to deal with the abstract question of an accountant's responsibility for unaudited statements, for that was not the issue. So long as we find that the Judge explicated the proper test applicable to the facts of this case, the duty inherent in the circumstances, and we do, we must also find that he gave the appellants a fair charge.

## IV

### *The Charge on "Unanimity"*

■ The trial judge charged as follows:

"Now, I instruct you that if you find that the proxy statement was false in

either one of these two respects that is sufficient to support a conviction."

As we have seen, there were two specifications of falsity in Count II, namely, the footnote and the earnings statement. The defense requested that the court advise the jury that, in order to convict, they must be unanimous on which, if either, of the two specifications had been proven materially false beyond a reasonable doubt.[10] This request was refused, and the court did not charge accordingly.

Appellants now contend that the charge given left the jury free to convict if only six of them believed the proxy statement to be materially false in one respect but the other six believed the proxy statement to be materially false in the other respect. Appellants conclude that even if the evidence was sufficient to warrant the submission of each of the allegedly false statements to the jury, the conviction still cannot stand, since it cannot be determined whether the jury did in fact unanimously agree on a single specification of falsity. Appellants cite no authority directly in point. The government cites no direct authority in this circuit, but cites two cases in the Ninth Circuit, *United States v. Friedman*, 445 F.2d 1076, 1083–84, *cert. denied sub nom. United States v. Jacobs*, 404 U.S. 958, 92 S.Ct. 326, 30 L.Ed.2d 275 (1971), and *Vitello v. United States*, 425 F.2d 416, 422–23 (1970), as directly in point. However, these cases are distinguishable.

In *Friedman*, the indictment alleged a conspiracy to violate several substantive statutes. The jury found appellants guilty of the conspiracy and of acts charged in particular substantive counts, thus indicating which violations in the conspiracy count the jury had found unanimously.

*Vitello* turned largely on the failure of counsel to object at trial. The court noted, however, that it would have had to follow *Yates v. United States*, 354 U.S.

---

**10.** This was not a request for a special verdict. Cf. *United States v. Spock*, 416 F.2d 165, 180–83 (1 Cir. 1969); and see *United States v.* *Adcock*, 447 F.2d 1337 (2 Cir.), *cert. denied*, 404 U.S. 939, 92 S.Ct. 278, 30 L.Ed.2d 252 (1971).

298, 311–12, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957), if "there was insufficient evidence to be submitted to the jury on any one or more of the specifications of falsity." 425 F.2d at 419.

The charge given by Judge Tyler is a charge generally given in this circuit. It is assumed that a general instruction on the requirement of unanimity suffices to instruct the jury that they must be unanimous on whatever specifications they find to be the predicate of the guilty verdict. We do not say it would be wrong for a trial judge to give the charge requested, but it is not error to refuse it.[11] And we do not change that rule.

The court properly charged that the jury needed only to find a defendant guilty on either of the two specifications in order to convict. Inasmuch as the evidence was sufficient to support Natelli's conviction on either specification, the charge given presents no problem to affirmance as to him.

A difficulty does arise, however, if it is found as a matter of law that there should have been a directed verdict for a defendant on one of the specifications for insufficiency of evidence. The verdict then becomes ambiguous, for the jury could have rejected the specification which the appellate court holds sufficiently proved, and have convicted only on the specification held to be insufficiently proved. In that event, there seems to be no alternative to remand for a new trial. That is the general principle. *Yates v. United States, supra; Stromberg v. California,* 283 U.S. 359, 367–68, 51 S.Ct. 532, 75 L.Ed. 1117 (1931). *See United States v. Jacobs, supra,* 475 F.2d at 283 and cases cited therein.

It is true, of course, that sometimes, as in a conspiracy to violate two different substantive statutes, the same evidence may support conviction of conspiracy to violate either or both. *See, e. g., Jacobs, supra,* 475 F.2d at 283–84.

■ When there is more than one specification as a predicate for guilt, each dependent on particular evidence which is unrelated to the other, it would be sound practice to instruct the jury that they must be unanimous on a particular specification to convict. Since that was not done here and since we have found that Scansaroli was not culpable on the earnings statement specification, the essence of which was the inclusion of the Eastern commitment, we must reverse his conviction and remand for trial on the footnote specification alone. We realize that we are reversing a conviction involving only 10 days of jail time. Whether it is important enough for the United States to retry him in the circumstances is a matter for decision by the United States Attorney on which we cannot pass judgment.

V

■ Appellants contend that Count II of the indictment should be dismissed for lack of proper venue. Prior to trial, appellants had jointly moved to dismiss Count II on the ground that proper venue lay only where the proxy statement had been filed with the Securities and Exchange Commission, the District of Columbia. The trial court denied the motion. We must consider the issue with the recognition that venue in criminal cases may raise "deep issues of public policy." *See United States v. Johnson,* 323 U.S. 273, 276, 65 S.Ct. 249, 89 L.Ed. 236 (1944).

---

11. In reaching this result, we believe that we are following *United States v. Remington,* 191 F.2d 246, 250 (2 Cir. 1951) (L. Hand, A. Hand & Swan, JJ.). There the defendant was convicted of perjury in falsely testifying before the Grand Jury that he had never been a member of the Communist Party. He had requested a charge that "all the jurors must be convinced that the accused was a member of the Party 'at a particular time and place,' and if some thought he was at one time only and some another, they could not convict him." Judge Swan agreed that "that request was right and should be given if there is a new trial" but he refused to label it reversible error to refuse the charge "since the substance of it was probably covered, though not so explicitly, by the charge that the jury must be unanimous."

Section 27 of the Securities Exchange Act, 15 U.S.C. § 78aa, provides that criminal proceedings for violations of the Act are to be brought in a district where "any act or transaction constituting the violation occurred." Appellants contend that the only critical act here was the filing of the proxy statement containing the false statements in the District of Columbia where it was delivered to the Commission, which is also where appellants' and Marketing's principal offices were. The government contends that there is venue for a charge of violation of Section 32 of the 1934 Act, 15 U.S.C. § 78ff,[12] in the Southern District of New York as well. The government asserts that it has proved that the false footnote and the false nine-months earnings statement were prepared in Manhattan, and that this suffices.[13]

In denying the pre-trial motion, the District Court held that the gravamen of the violation under section 32 was the making of the false statement, not the filing, the words of the statute "required to be filed" merely describing a category of documents rather than the essence of the offense. The government, in support, notes the general venue provision for continuing offenses.[14]

Appellants retort that Section 27 of the 1934 Act stands apart from the continuing offense statute, arguing that it comes within the exception used when Congress has specifically provided for alternate venue. Appellants find support in Travis v. United States, 364 U.S. 631, 81 S.Ct. 358, 5 L.Ed.2d 340 (1961), which held that the proper venue for an offense under 18 U.S.C. § 1001, the False

Statements Act, was not the district in which the false statement was made, but only the district where the affidavit had to be filed, the District of Columbia. The rationale of the decision, as we read it, was that section 1001 proscribes false statements "in any matter within the jurisdiction of any department or agency of the United States" and that the National Labor Relations Board had no such "jurisdiction" under Section 9(h) of the National Labor Relations Act, as amended,[15] until the non-Communist affidavit required by the statute as a precondition to NLRB investigation was actually filed in Washington, D. C.[16]

The majority opinion in Travis was careful to note that "[t]he decisions are discrete, each looking to the nature of the crime charged." 364 U.S. at 635, 81 S.Ct. at 361. And this court has annotated Travis by stating that "the decision surely was meant to be confined to the facts based on the unusual statute involved." See United States v. Slutsky, 487 F.2d 832, 839 n.8 (2 Cir. 1973), cert. denied, 416 U.S. 937, 94 S.Ct. 1937, 40 L.Ed.2d 287 (1974). See also United States v. Ruehrup, 333 F.2d 641, 643 (7 Cir.), cert. denied, 379 U.S. 903, 85 S.Ct. 194, 13 L.Ed.2d 177 (1964); Imperial Meat Co. v. United States, 316 F.2d 435, 440 (10 Cir.), cert. denied, 375 U.S. 820, 84 S.Ct. 57, 11 L.Ed.2d 54 (1963).

Appellant seeks to come within the Travis holding by arguing that just as in Travis where the filing of the non-Communist affidavit was simply a prerequisite to future conduct, resort to NLRB processes, so the filing of a proxy statement is merely the prerequisite to future

---

**12.** See note 1, supra.

**13.** Appellants do not seriously contend that there was no preparation in the Southern District as a matter of fact.

**14.** 18 U.S.C. § 3237(a) reads:

(a) Except as otherwise expressly provided by enactment of Congress, any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed.

**15.** 61 Stat. 136, 146, amended, § 1(d), 65 Stat. 601, 602, repealed, § 201(d) of the Labor-Management Reporting and Disclosure Act of 1959, 73 Stat. 519, 525.

**16.** If the "jurisdiction of the agency" exists where the false statement is made, however, the continuing offense statute is applicable to venue even in section 1001 cases. United States v. Candella, 487 F.2d 1223 (2 Cir. 1973), cert. denied, 415 U.S. 977, 94 S.Ct. 1563, 39 L.Ed.2d 872 (1974).

conduct, the solicitation of proxies. The argument is unsound.

In *Travis*, the labor board had no jurisdiction to make an investigation of labor practices "unless there is on file with the Board" a non-Communist affidavit. Here the filing of the proxy statement is part of the continuous process of the solicitation of proxies. Proxy statements are filed only at such time as the persons filing require proxies for some corporate purpose.[17] The filing and solicitations are part of the same process. We hold that there was venue in the Southern District of New York.

We have considered the other arguments raised by appellants and find them without merit. Judgment affirmed as to appellant Natelli; as to appellant Scansaroli judgment reversed and remanded for a new trial.

## ON PETITION FOR REHEARING BY UNITED STATES

GURFEIN, Circuit Judge:

The United States petitions for rehearing of that portion of our decision, filed July 28, 1975, 527 F.2d 311 (2 Cir.) which reversed the conviction of Scansaroli and remanded for a new trial as to him.

Natelli and Scansaroli were tried and convicted on a single count of wilfully making and causing to be made false and misleading material statements in a proxy statement. The single count specified two false statements: the "footnote" and the "nine-months earnings statement." This court found sufficient evidence on each specification to sustain Natelli's conviction but held as to Scansaroli that there was insufficient evidence to go to the jury on the second specification. On that basis, we concluded that as to Scansaroli the jury might have convicted only on the specification held to be insufficiently proved. 527

F.2d at 325. We accordingly remanded for a new trial.

The government calls our attention to cases in this circuit which have held that a general motion to dismiss a count with several specifications is insufficient to preserve on appeal the point that where one of the specifications is insufficiently proved the conviction on the entire count must be reversed. These cases hold that, to preserve the point on appeal, a specific motion must be made in the trial court to withdraw the particular specification from jury consideration. *United States v. Mascuch,* 111 F.2d 602, 603 (2 Cir.), *cert. denied,* 311 U.S. 650, 61 S.Ct. 14, 85 L.Ed. 416 (1940); *United States v. Goldstein,* 168 F.2d 666, 671 (2 Cir. 1948).

No separate motion was made by Scansaroli to withdraw the earnings statement specification from consideration by the jury. He did move to strike evidence concerning the Eastern Airlines affair and also asked for an instruction that the jury had to be unanimous on each specification, but he did not move to dismiss the specification for insufficiency. The failure to move may have been dictated by tactical considerations on the theory of his able counsel that it is easier to attack a weak specification in the hope of a spillover to the stronger one. Be that as it may, we feel bound to follow the *Mascuch-Goldstein* rule, particularly in view of its eminent authorship.

Accordingly, we are constrained to grant the government's petition for rehearing, and, upon rehearing, we withdraw our former determination and affirm the conviction of Scansaroli as well as Natelli.

We might suggest that in view of the turn Scansaroli's case has taken and the short sentence he received from Judge Tyler, the District Judge who inherits the case ought carefully to consider a Rule 35 application to suspend the 10 days of jail time imposed.

---

**17.** We may note that, paradoxically, in most cases arising under the 1934 Act, the defendants would presumably contend that they wished to be tried in their home districts rather than in the District of Columbia. Here the appellants happen to live and work in the District of Columbia and have been tried elsewhere, a rather unusual situation.

*On SCANSAROLI's Petition
for Rehearing*

GURFEIN, Circuit Judge:

This matter comes before the panel again on Scansaroli's petition for rehearing pursuant to our grant of permission. On the original appeal we had reversed appellant's conviction and remanded for a new trial.[1]

The single count charging violation of 15 U.S.C. § 78ff(a) upon which he was convicted involved the making of a false proxy statement which specified two false items therein: the "footnote" and the "nine-months earnings statement." We held that there was insufficient evidence to convict Scansaroli on the latter specification. See main opinion, 527 F.2d 311, 322, decided July 28, 1975.

We then granted a rehearing on the government's petition and held that under an old doctrine in this circuit we were constrained to decide that the failure of appellant specifically to ask the trial court to withdraw one of two specifications in a single count on the ground that it was insufficiently proved precluded appellate consideration. *United States v. Mascuch*, 111 F.2d 602, 603 (2 Cir.), *cert. denied*, 311 U.S. 650, 61 S.Ct. 14, 85 L.Ed. 416 (1940); *United States v. Goldstein*, 168 F.2d 666, 671 (2 Cir. 1948).

We accordingly reversed ourselves on the decision to grant a new trial to Scansaroli. We now withdraw our opinion on rehearing and reconsider this difficult question of appealability *de novo*.

We start with the proposition that there are many criminal cases where the failure to object has resulted in affirm-

ance under Rule 30 as applied in Rule 52(a). Appellant's rather strident cries that our decision against him is unprecedented are hardly impressive. Many convictions are denied appellate review for failure to call the alleged error to the attention of the trial court so as to enable it to consider correction before verdict. Otherwise appellate review would become a game of hindsight.

I

We recognize, nevertheless, that even under the *Mascuch-Goldstein* line of cases, a proper request to the trial court would save the point. See, *e. g.*, *United States v. Adcock*, 447 F.2d 1337, 1338–39 (2 Cir.), *cert. denied*, 404 U.S. 939, 92 S.Ct. 278, 30 L.Ed.2d 252 (1971);[2] *United States v. Pollak*, 474 F.2d 828 (2 Cir. 1973). And see also *Warszower v. United States*, 312 U.S. 342, 345, 61 S.Ct. 603, 85 L.Ed. 876 (1941).[3] As we indicated in our original opinion, that is because *Yates v. United States*, 354 U.S. 298, 311–12, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957),[4] and *Stromberg v. California*, 283 U.S. 359, 367–68, 51 S.Ct. 532, 75 L.Ed. 1117 (1931), can be read as covering the situation where a jury may have convicted on the very specification which is insufficiently proved to make out an offense.

That is true, especially, when the specifications in the single count relate to two distinct incidents or fact patterns, see *United States v. Guterma*, 281 F.2d 742, 747 (2 Cir.), *cert. denied*, 364 U.S. 871, 81 S.Ct. 114, 5 L.Ed.2d 93 (1960), rather than being merely a charge of alternate ways of violating a statute stated in the conjunctive. Cf. *United*

---

1. This opinion assumes knowledge of our original opinion, 527 F.2d 311 (2 Cir. 1975).

2. In *Adcock*, we reversed a conviction which charged the making of a false statement in violation of 18 U.S.C. § 1001 where the count ultimately reversed contained three assignments of falsity, two of which were sufficiently supported by the evidence. The government conceded on appeal that a proper motion to strike had been made pursuant to the *Mascuch-Goldstein* rule, but argued that appellant should, in addition, have moved for a special

verdict. We held in *Adcock* that a special verdict would have been improper and hence a motion for such a verdict was unnecessary.

3. There the defendant had moved to strike from the record or exclude from the consideration of the jury each of the four alleged false statements.

4. In *Yates* it is not clear what protective measures appellant had taken below. The Court of Appeals had noted that many motions had been made. 225 F.2d 146, 149 (9 Cir. 1955).

*States v. Astolas*, 487 F.2d 275, 280 (2 Cir. 1973), *cert. denied*, 416 U.S. 955, 94 S.Ct. 1968, 40 L.Ed.2d 305 (1974).

Assuming, as we have already in our original opinion, that reversal of the conviction of Scansaroli is required if counsel adequately raised the point below, we turn to the question of how much must be done by defense counsel to protect the record.

## II

The Federal Rules of Criminal Procedure cast no light on the matter. Rule 29(a) simply provides for a motion for judgment of acquittal "of one or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses." No provision is made for a motion to withdraw one of two specifications in a single count on the ground of insufficiency. There may be an implication in Rule 30 that the failure to object to a particular specification is fatal because it amounts to a failure to object to an "omission" from the charge, but that is not clear. Finally, there is nothing in Rule 52(b) that tells us that the failure of the trial court to withdraw the particular specification *without request* is "plain error."

## III

We must also consider the matter in practical terms, not only from the point of view of the particular defendant, but also in consideration of the requirements of the criminal justice process. Rule 7(c)(1) provides that "[i]t may be alleged in a single count that . . . he [the defendant] committed it [the offense] by one or more specified means." The government treats the separate incidents of "the footnote" and the "nine-months statement" as specified means for committing the single crime. See original opinion, at 314–315. And no one doubts

that for pleading purposes the prosecution is right.

The government has argued from this that if our original ruling stands, it would compel the government in any false statement case, simply out of caution, to allege each incident constituting the "means" of committing the offense in a *separate count* or risk the reversal of a conviction based on afterthoughts on appellate review. We believe that this might be the better practice in cases like this where the incidents charged as in violation of a statute are discrete. On the other hand, when that is not done, appellate review is not generally available when the particular insufficiency has not in some way been called to the attention of the trial judge. We do not believe that *Yates, supra*, in spite of its broad language, dictates a contrary result. Cf. *Turner v. United States*, 396 U.S. 398, 420 & n.42, 90 S.Ct. 642, 24 L.Ed.2d 610 (1970).

What prompts our present consideration of Scansaroli's petition for rehearing is his argument that he did make it sufficiently clear to the trial judge that he wanted a judgment of acquittal or some equivalent on the "nine-months earnings statement" specification. On reconsideration, we agree that the arguments of counsel for Scansaroli with respect to the sufficiency of the evidence, his motion to strike the evidence relating to the Eastern commitment (an essential part of the "nine-months earnings statement" specification) and the *co-defendant's* specific motion to withdraw the specification on the nine-months earnings statement make this a close question.[5] Cf. *United States v. Lefkowitz*, 284 F.2d 310, 313 n.1 (2 Cir. 1960). As the Supreme Court has recently intimated in *Anderson v. United States*, 417 U.S. 211, 223 n.12, 94 S.Ct. 2253, 2262, 41 L.Ed.2d 20 (1974), we may, in our discretion, consider a "sufficiency-

---

5. We recognize that we cannot find fault with the distinguished District Judge, Harold Tyler, for not recognizing the various motions as a single request. We treat them, however, as sufficient to permit review in the interests of justice.

of-the-evidence claim" even though the question arose below "only with respect to the admissibility of [certain] testimony." While *Anderson* also involved the question of whether the particular indictment was *unconstitutionally* vague, and all the cases cited by Mr. Justice Marshall involved similar *constitutional* questions, we have concluded that we have sufficient discretion to adopt the reasoning in *Anderson* on this appeal.

Accordingly, we do not purport to lay down a firm rule to govern the precise action required below for appealability where a single count contains more than one specification. Indeed, we could hardly do so without the empaneling of an *en banc* court. We decide simply, on further consideration, that appellant in this case did enough below to satisfy the spirit of the *Mascuch-Goldstein* rule. We accordingly withdraw our opinion on the government's petition and reinstate our original opinion as to Scansaroli in all respects. Cf. *United States v. Love*, 472 F.2d 490, 496 (5 Cir. 1973).